**UNITED STATES of America,**

v.

John F. "Duffy" CONLEY, William C. Curtin, Sheila F. Smith, John Francis "Jack" Conley, Thomas "Bud" McGrath, Mark A. Abbott, Thomas Rossi, William Steinhart, Roberta Fleagle, Robin Spratt, Monica C. Kail, William J. Reed, Joanne T. Smith, Kenneth "Ron"

Goodwin, Lawrence N. "Neudy" Demino, Sr., Christopher "Chris" Kail, Joseph A. Devita, Frank Garofalo, Thomas D. Ciocco, Michael Sukaly, Phillip M. "Mike" Ferrell, Anestos "Naz" Rodites, and William E. Rusin, Defendants.

Crim. No. 91–178.

United States District Court, W.D. Pennsylvania.

Jan. 7, 1994.

---

Frederick W. Thieman, U.S. Atty., James R. Wilson, Asst. U.S. Atty., W.D. Pa., William D. Braun, Crim. Div., U.S. Dept. of Justice, Washington, DC, for plaintiff.

James Wymard, William Difenderfer, Anthony Mariani, Ellen Viakley, Gary Gerson, Caroline M. Roberto, Joel Johnston, Stanley Greenfield, Martha Bailor, Ray Radakovich, Carmen Martucci, Lee Markovitz, Edward J. Osterman, William Acker, Foster Stewart, Joseph Kanfoush, Carl Max Janavitz, Raymond M. Maloney, John Goodrich, Gary B. Zimmerman, Vincent Baginski, John Zagari, Pittsburgh, PA, for defendants.

## INDEX

I. "Standing" ................................................ 1014

 (A) Searches and Seizures of Machines from Approximately 80 Locations 1014
 (i) Findings of Fact ......................................... 1014
 (ii) Discussion ............................................. 1015
 (a) Procedural Background ............................. 1015
 (b) The Applicable Legal Standard ....................... 1016
 (c) Duffy Conley's Contentions.......................... 1019
 (d) The Government's Contentions ....................... 1019
 (e) The Court's Analysis ............................... 1020
 (iii) Conclusions of Law ..................................... 1022
 (B) Reasonable Expectations of Privacy in 930 Saw Mill Run ........... 1022
 (i) Findings of Fact ......................................... 1022
 (ii) Conclusions of Law ..................................... 1022

II. The Merits ................................................ 1022

 (A) The Issuance of Search Warrants on September 22, 1988 ........... 1022
 (i) Finding of Fact ......................................... 1022
 (ii) Discussion ............................................. 1025
 (iii) Conclusions of Law ..................................... 1026
 (B) Material Omissions from the September 23, 1988 Search Warrant Application for 930 Saw Mill Run ................................... 1026
 (i) Findings of Fact ......................................... 1026
 (a) The Existence of 3100 Windgap Road ................. 1026
 (b) Date of Conduct underlying Prior Conviction .......... 1026
 (c) Date of Applications for Permits then on Current Display 1027
 (ii) Discussion ............................................. 1027
 (a) The Applicable Law ................................. 1027
 (b) The Existence of 3100 Windgap Road ................. 1027
 (c) Date of Conduct underlying Prior Conviction .......... 1027
 (d) Date of Applications for Permits then on Current Display 1028
 (iii) Conclusions of Law ..................................... 1028
 (C) The Execution of the Search Warrant for 930 Saw Mill Run on September 23, 1988 ............................................... 1028
 (i) Findings of Fact ......................................... 1028

 (ii) Discussion ............................................... 1030
 (a) Choice of Law ....................................... 1030
 (b) Reasonableness under Fourth Amendment Standards.... 1031
 (iii) Conclusions of Law ...................................... 1032
**ORDER OF COURT** ............................................... 1032

---

## MEMORANDUM OPINION

LEE, District Judge.

Before the Court are the Defendants' motions challenging various searches conducted on September 23, 1988 by state officers pursuant to state warrants.[1]

## I. "Standing"

(A) *Searches and Seizures of Machines from Approximately 80 Locations*

(i) *Findings of Fact*

1. On September 23, 1988, state and local police officers, pursuant to state warrants, simultaneously searched approximately 100 separate locations—bars, delicatessens, coffee shops, etc.—for evidence of illegal video poker machine gambling.

2. At approximately 80 locations, video poker machines owned by Defendant John F. "Duffy" Conley ("Duffy Conley"), the sole proprietor of Duffy's Vending Company, were seized. The police seized poker machines, removed them to a secure location, and then forced opened the compartments of the machines. No further search warrants were obtained.

---

1. Numerous motions are before the Court and require a short explanation for clarity's sake.

Several motions are before the Court for the first time: (1) John Francis "Jack" Conley's Omnibus Pretrial Motion: Motion to Suppress Physical Evidence [1988 searches other than 930 Saw Mill Run] (Document No. 374, in part); (2) Pretrial Motions of John F. "Duffy" Conley: Defendant's Motion to Suppress [9/23/88 search of Windgap] (Document No. 377, in part); (3) Pretrial Motions of John F. "Duffy" Conley: Defendant's Motion to Suppress [contents of machines seized in 1988 searches] (Document No. 377, in part); (4) Pretrial Motions of John F. "Duffy" Conley: Defendant's Motion to Suppress Telephonic Interceptions [Windgap location only] (Document No. 377, in part).

The second referenced motion and part of the first referenced motion, both regarding the September 23, 1988 search of 3100 Windgap Road, appear to be moot. Though the Government states that it will introduce no evidence seized in that search, Defendant John F. "Duffy" Conley persists in challenging it. The only evidence of which the Court is aware that is arguably derivative of the search is the statement Defendant William C. Curtin gave to police officers that day. This Court, however, has already found Curtin's statement to be voluntary. *United States v. Conley*, Cr. No. 91–178, slip op. at 15–19 (W.D.Pa. July 15, 1993) (Document No. 740). Assuming the September 23, 1988 search of Windgap was illegal, the Court's previous finding that Curtin's statement was voluntary establishes that his statement is not "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). The Court will therefore deny as moot all motions challenging the September 23, 1988 search of 3100 Windgap Road. *Cf. Rakas v. Illinois*, 439 U.S. 128, 132 n. 2, 99 S.Ct. 421, 425 n. 2, 58 L.Ed.2d 387 (1978). If the Defendants can point to evidence indirectly derived *solely* from said search, the Court, of course, will have to address the merits of the motions to suppress.

The fourth referenced motion has been abandoned or, perhaps, superseded. *See* (Document Nos. 466, in part; 467; 530; and, 532). In any event, Pretrial Motions of John F. "Duffy" Conley: Defendant's Motion to Suppress Telephonic Interceptions [Windgap location only] (Document No. 377, in part) will be denied as moot. The subsequent motions have yet to be briefed and are not before the Court.

There are several motions to suppress regarding the September 23, 1988 search of 930 Saw Mill Run that are before the Court for a second time. The Court's order suppressing the evidence seized in that search was reversed. *United States v. Conley*, 813 F.Supp. 372 (W.D.Pa.1993), *rev'd*, 4 F.3d 1200 (3d Cir.1993). There are several contentions that have not been addressed by this Court or the Court of Appeals for the Third Circuit. The contentions are found in Defendant Jack Conley's Omnibus Pretrial Motion: Motion to Suppress Physical Evidence (Document No. 374, in part), Pretrial Motions of John F. "Duffy" Conley: Motion to Suppress Physical Evidence (Document No. 377, in part), and Defendant Sheila Smith's First Supplemental Motion to Suppress Physical Evidence (930 Saw Mill Run Boulevard) (Document No. 448). Because he had no Fourth Amendment rights in the 930 Saw Mill Run premises, Defendant Curtin's Pretrial Motions: Motion to Suppress (Document No. 393, in part) was denied. That ruling will not be revisited.

There are numerous motions to join in the motions indexed in this footnote. The disposition of these motions to join will be reflected in the Order of Court accompanying this Memorandum Opinion.

3. Duffy Conley had no proprietary or possessory interest in most of the locations from which his machines were seized.

4. The seized video poker machines were visible to all patrons of the searched businesses. The video poker machines were in areas that were open to the public.

5. A typical video poker machine was encased in a cabinet approximately five feet tall, three feet wide and three feet deep. The video display monitor, where a player viewed the game, was located at the top front of the cabinet. Below the video display monitor was the control panel, which contained the buttons that enabled a player to operate the machine. Two compartments, an upper compartment and a lower compartment, were located below the control panel and made up the remainder of the machine.

6. In a typical video poker machine,[2] the upper compartment, with a volume of about three cubic feet, contained the electronics that made the machine a video poker machine. It contained a circuit board and meters. Duffy's Vending Company employees also stored service slips and keys to the lower compartment in the upper compartment.

7. The upper compartment was secured by a lock and key. Only Duffy Conley and certain employees whom he designated had access to the keys to the upper compartments of machines. Only those with access to the keys had access to the upper compartments.

8. The owners and operators of the locations in which the machines were placed did not have access to the keys to the upper compartment. Therefore, they did not have access to the upper compartments.

9. The lower compartment contained a detachable receptacle into which the bills and coins fed into the machine by players fell.

10. The lower compartment was also secured by a lock and key. The owners and operators of the machines had keys to the lower compartment. For each machine, the keys to the upper and lower compartments were different.

11. The seized video poker machines were equipped with electronic "knock off" switches, which removed accumulated credits when players were paid-off. They were also equipped with meters to record the total amount of credits granted for money deposited and the amount of credits "knocked off" when players were paid-off. With each credit worth twenty-five cents, the machine recorded both its own gross receipts and receipts net of money paid out as winnings to players.

12. By pressing the buttons on the control panel in a certain sequence, the information stored in the meter functions could be displayed on the video display monitor.

13. When a collector from Duffy Vending arrived to service a machine and collect money from the machine, the collector accessed the meter functions. The information then shown on the video display monitor, although unintelligible to the uninitiated, was available to be viewed by anyone present at the location who cared to look at it.

14. The *capias* clauses of the warrants executed at the eighty locations authorized the seizure of numerous items including remote or internal "knock-off" switches, all money wagered in the machines, money intended for pay-offs on machines, records of pay-offs, meters, keys to machines and other paraphernalia indicative of illegal gambling.

(ii) *Discussion*

(a) Procedural Background

The Court has been "instructed that in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court 'abandoned a separate inquiry into a defendant's "standing" to contest an allegedly illegal search in favor of an inquiry that focused directly on the substance of the defendant's claim that he or she possessed a "legitimate

---

**2.** There is evidence in the record of "atypical" video poker machines, which do not conform exactly to the description in the text. These atypical machines were placed at locations controlled by Duffy Conley. The main difference was that the atypical video poker machines did not contain a divider between the upper and lower compartments. Thus, access to one compartment afforded access to both compartments.

expectation of privacy" in the area searched,'" *United States v. Felton,* 753 F.2d 256, 259 (3d Cir.1985) (quoting *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980)). Nonetheless, the Court, in an effort to simplify and expedite the lengthy pretrial proceedings in this case, has employed the "standing" terminology as "short-hand" for expectations protected by the Fourth Amendment. The Court has attempted to adjudicate, without reference to the merits, the defendants' Fourth Amendment motions and joinders therein, where it has been clear that no federally secured right of a particular defendant has been violated. *Cf. Rawlings v. Kentucky,* 448 U.S. 98, 111–12, 100 S.Ct. 2556, 2564–65, 65 L.Ed.2d 633 (1980) (Blackmun, J., concurring); *see, e.g.,* General Order of Court 13, ¶ 3, *United States v. Conley,* Cr. No. 91–178 (W.D.Pa. March 4, 1993) (Document No. 616). Generally, this approach has had a salutary effect.[3]

With reference to the eighty searches conducted on September 23, 1988, the Court held a hearing pursuant to *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), at which Defendant Duffy Conley testified.[4] The hearing was to determine whether or not the Court, without referring to probable cause and the warrants for the eighty locations, could properly conclude that the police violated none of Duffy Conley's Fourth Amendment rights. For the following reasons, the Court regrettably concludes that it cannot reach such a conclusion and must review the circumstances of each of the eighty searches.

(b) The Applicable Legal Standard

Early in the twentieth century, a defendant's Fourth Amendment rights were inti-mately dependent on the defendant's property rights. *See, e.g., Gouled v. United States,* 255 U.S. 298, 309–11, 41 S.Ct. 261, 265, 65 L.Ed. 647 (1921), *overruled, Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Olmstead v. United States,* 277 U.S. 438, 464–67, 48 S.Ct. 564, 567–69, 72 L.Ed. 944 (1928), *overruled, Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *see also Warden v. Hayden,* 387 U.S. 294, 303–04, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782 (1967). By the late 1960's, however, the Supreme Court was shifting the focus of its Fourth Amendment jurisprudence away from property rights and towards privacy rights. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Hayden,* 387 U.S. at 304–08, 87 S.Ct. at 1648–50. Emphasizing the dual innovations of recognizing privacy interests under the Fourth Amendment and excluding items seized in violation of the Fourth Amendment pursuant to the exclusionary rule, *Hayden,* 387 U.S. at 304–08, 87 S.Ct. at 1648–50, the Court concluded that "[t]he premise that property interests control the right of the Government to search and seize has been discredited." *Id.* at 304, 87 S.Ct. at 1648.

Shortly after the Court's decision in *Hayden,* the privacy innovation was clearly declared in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Supreme court recognized that the Fourth Amendment "protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all." *Id.* at 350, 88 S.Ct. at 510. The Court emphasized that "the Fourth Amendment protects people, not places." *Id.* at 351, 88 S.Ct. at

---

**3.** All counsel in this case practice in Pennsylvania state courts, which follow an "automatic standing" doctrine with respect to possessory offenses and, arguably, are otherwise more inclined to hold that a defendant has standing to challenge a search on state ·constitutional grounds. *See Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457, 468–69 (1983); *see also Commonwealth v. Peterkin,* 511 Pa. 299, 309–10, 513 A.2d 373, 377–78 (1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987); *Commonwealth v. DiGiovanni,* 428 Pa.Super. 81, 630 A.2d 42, 44 n. 1 (1993); *cf. Commonwealth v. Peterson,* 535 Pa. 492, 636 A.2d 615, 617–619

(1993) (*Sell* governs standing, but reasonable expectations of privacy govern the merits). Most counsel have filed motions to join in every motion to suppress on Fourth Amendment grounds, irrespective of their clients' colorable Fourth Amendment expectations.

**4.** Numerous Defendants have moved to join in Duffy Conley's challenge to the eighty searches in question or filed their own motion challenging said searches. No other Defendant, however, has attempted to prove his or her Fourth Amendment rights with respect to such searches. Their motions will be denied on that basis.

511. Holding that the defendant's Fourth Amendment rights were violated when the government listened to and recorded his conversations within a telephone booth, the Court stated that a " 'search and seizure' " occurred when the government "violated the privacy upon which he justifiably relied." *Id.* at 353, 88 S.Ct. at 512.

Concurring in *Katz,* Justice Harlan stated, "My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' " *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring). Justice Harlan's formulation of the "reasonable expectation of privacy" test is the formulation now applied by the majority of the Court. *See, e.g., Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602, 616, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639 (1989); *California v. Greenwood,* 486 U.S. 35, 39, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30 (1988); *Oliver v. United States,* 466 U.S. 170, 177, 104 S.Ct. 1735, 1740, 80 L.Ed.2d 214 (1984).

Prior to the property/privacy innovations of *Hayden* and *Katz,* it was well established that Fourth Amendment rights were personal and one who was not aggrieved by the search or seizure could not object to the admission of the seized evidence. *Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960), *overruled, United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *Hatch v. Reardon,* 204 U.S. 152, 160, 27 S.Ct. 188, 190, 51 L.Ed. 415 (1907). That is, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois,* 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978) (citing *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969)).

In *Rakas,* as noted *supra,* Part I(A)(ii)(a), the Supreme Court abandoned previous case law that had suggested that a separate inquiry into who was an aggrieved party, an inquiry into "standing," was required or useful. The Court instructed that a court's inquiry should be directed to "the substantive question of whether or not the proponent of the motion to suppress has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." *Rakas,* 439 U.S. at 133, 138–40, 99 S.Ct. at 425, 427–28.

Further, the Court cited the *Katz* "legitimate expectation of privacy" test as providing guidance in defining protected Fourth Amendment interests. *Id.* at 143 & n. 12, 99 S.Ct. at 430 & n. 12. The Court took care to state that property interests were neither necessary nor sufficient conditions precedent to a reasonable expectation of privacy.[5] *Id.*

In *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) and its companion case, *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), the Court placed almost exclusive reliance on reasonable expectations of privacy in defining the scope of Fourth Amendment rights. The *Salvucci* Court, as one of the reasons for rejecting the "automatic standing" rule of *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), "decline[d] to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched." *Salvucci,* 448 U.S. at 92, 100 S.Ct. at 2553; *see also id.* at 91 & n. 6, 100 S.Ct. at 2553 & n. 6.

In *Rawlings,* the defendant contended that his ownership of the items seized conferred the right to challenge the search of another's purse, where the items seized had been located. The Supreme Court rejected his contention, stating:

> While petitioner's ownership of the drugs is undoubtedly one fact to be considered in

---

**5.** The dissenting opinion in *Rakas* argued that the Court's rejecting the "legitimately on the premises" standard as a measure of legitimate expectations of privacy in the areas searched resulted in a return to a pre-*Katz* property test. *Rakas,* 439 U.S. at 164–65, 99 S.Ct. at 441 (White, J., dissenting).

this case, *Rakas* emphatically rejected the notion that "arcane" concepts of property law ought to control the ability to claim *the protections of the Fourth Amendment.* See 439 U.S. at 149–150, n. 17 [99 S.Ct. at 433, n. 17.] See also *United States v. Salvucci, ante* [448 U.S.], at 91–92 [100 S.Ct. at 2553].

*Id.* at 105, 100 S.Ct. at 2561 (emphasis added). Notwithstanding *Salvucci* and *Rawlings,* the Supreme Court's subsequent cases have reaffirmed that the Fourth Amendment protects certain property interests.

■ Adopting distinct definitions of a "search" and a "seizure," the Court has held that the Fourth Amendment's prohibition against unreasonable "seizures" protects property interests. *Soldal v. Cook County,* — U.S. —, —, 113 S.Ct. 538, 544, 121 L.Ed.2d 450 (1992) (citing cases); *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). In *Jacobsen,* the Court first clearly enunciated the distinction, stating:

[The Fourth Amendment] protects two types of expectations, one involving "searches," the other "seizures." A "search" occurs when an expectation of privacy that society is prepared to accept as reasonable is infringed. A "seizure" of *property* occurs when there is some meaningful interference with an individual's *possessory interests in that property.*

*Id.* at 113, 104 S.Ct. at 1656 (emphasis added). The Court has also distinguished the manner in which the Fourth Amendment protects the two expectations.

■ Absent a recognized exception, the probable cause, particularity and warrant requirements of the Fourth Amendment apply equally to searches and seizures. The Court has recently stated, "Time and again, this Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson,* — U.S. —, —, 113 S.Ct. 2130, 2135, 124 L.Ed.2d 334 (1993) (internal quotations and citations omitted). What distinguishes the Fourth Amendment protections against searches from those against seizures are the applicable exceptions to the warrant, probable cause and particularity requirements.

■ Writing for a unanimous Court in *Soldal,* Justice White explained the intimate relationship between the "plain view" doctrine, which permits warrantless seizures, and property interests protected by the Fourth Amendment. He stated:

Suppose for example that police officers lawfully enter a house, by either complying with the warrant requirement or satisfying one of its recognized exceptions—*e.g.,* through a valid consent or a showing of exigent circumstances. If they come across some item in plain view and seize it, no invasion of personal privacy has occurred. *Horton [v. California],* 496 U.S. [128], at 133–34, 110 S.Ct. [2301], 2305–2306 [110 L.Ed.2d 112]; [*Texas v.*] *Brown,* 460 U.S. [730], at 739, 103 S.Ct. [1535], at 1541 [75 L.Ed.2d 502] (opinion of REHNQUIST, J.). *If the boundaries of the Fourth Amendment were defined exclusively by rights of privacy, "plain view" seizures would not implicate that constitutional provision at all.* Yet, far from being automatically upheld, "plain view" seizures have been scrupulously subjected to Fourth Amendment inquiry. *Thus, in the absence of consent or a warrant permitting the seizure of the items in question, such seizures can be justified only if they meet the probable cause standard,* Arizona v. Hicks, 480 U.S. 321, 326–327, 107 S.Ct. 1149, 1153–1154, 94 L.Ed.2d 347 (1987), *and if they are unaccompanied by unlawful trespass.* Horton, 496 U.S., at 136–137, 110 S.Ct., at 2307–2309. That is because the absence of a privacy interest notwithstanding, "[a] seizure of the article ... would obviously invade the owner's possessory interest." *Id.,* at 134, 110 S.Ct., at 2306; see also *Brown, supra,* 460 U.S., at 739, 103 S.Ct., at 1541 (opinion of REHNQUIST, J.). The plain view doctrine "merely reflects an application of reasonableness to the law governing *seizures of property,*" *ibid.; Coolidge v. New Hampshire,* 403 U.S. 443, 468, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1971); *id.,* at 516,

91 S.Ct., at 2063 (White, J., concurring and dissenting).

*Soldal,* —— U.S. at —— – ——, 113 S.Ct. at 545–46. As an exception to the warrant and particularity requirements, the "plain view" doctrine is strictly limited to its justifications. The Court has stated the determinants of its applicability as follows:

> It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify warrantless seizure. First, not only must the item be in plain view; its incriminating character must also be "immediately apparent." ... Second, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself.

*Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990) (citations omitted); *see also Dickerson,* —— U.S. at —— – ——, 113 S.Ct. at 2136–37; *Soldal,* —— U.S. at —— n. 10, 113 S.Ct. at 546 n. 10. In *Horton,* the Court stressed that the plain view doctrine allows warrantless *seizure,* but it cannot overcome a reasonable expectation of privacy and justify an otherwise invalid warrantless search. The Supreme Court noted:

> Even if the item is a container, its seizure does not compromise the interest in preserving the privacy of its contents because it may only be opened pursuant to either a search warrant, see *Smith v. Ohio,* 494 U.S. 541 [110 S.Ct. 1288, 108 L.Ed.2d 464] (1990); *United States v. Place,* 462 U.S. 696, 701 [103 S.Ct. 2637, 2641, 77 L.Ed.2d 110] (1983); *Arkansas v. Sanders,* 442 U.S. 753 [99 S.Ct. 2586, 61 L.Ed.2d 235] (1979); *United States v. Chadwick,* 433 U.S. 1 [97 S.Ct. 2476, 53 L.Ed.2d 538] (1977); *United States v. Van Leeuwen,* 397 U.S. 249 [90 S.Ct. 1029, 25 L.Ed.2d 282] (1970); *Ex parte Jackson,* 96 U.S. 727, 733

[24 L.Ed. 877] (1878), or one of the well-delineated exceptions to the warrant requirement. See *Colorado v. Bertine,* 479 U.S. 367 [107 S.Ct. 738, 93 L.Ed.2d 739] (1987); *United States v. Ross,* 456 U.S. 798 [102 S.Ct. 2157, 72 L.Ed.2d 572] (1982).

*Id.* 496 U.S. at 141 n. 11, 110 S.Ct. at 2310 n. 11. Thus, under the Supreme Court's current Fourth Amendment jurisprudence, government conduct may violate the Fourth Amendment if it unreasonably invades one's reasonable expectations of privacy *or* one's ownership or possessory interests in certain property.[6]

### (c) Duffy Conley's Contentions

Duffy Conley disavows any claim to a reasonable expectation of privacy in the eighty locations from which his machines were seized. Rather, he asserts that he had a reasonable expectation of privacy in the closed and locked compartments of the machines themselves. Moreover, Duffy Conley claims ownership of and possessory interests in the machines. He contends that he has "standing," irrespective of any reasonable expectations of privacy, because his possessions were the object of the searches. (*See* Document No. 687, at 29–30).

Further, Duffy Conley contends, if the Government claims that the searches of the video poker machines were conducted on the authority of the warrants for the locations at which the machines were seized, his claimed reasonable expectation of privacy in the contents of the seized video poker machines grants him standing to challenge the issuance and execution of the warrants.

### (d) The Government's Contentions

The Government contends that Duffy Conley's concession that he had no reasonable expectation of privacy in the premises where the machines were located forecloses a challenge to the seizure of the machines. Moreover, the Government does indeed contend that the warrants authorized the officers to search the insides of the seized video poker machines, because the items described in the

---

**6.** The Supreme Court has made clear that not all property interests are afforded protection. Open areas outside of the curtilage of the house are not included within the Fourth Amendment's coverage because such areas do not qualify as persons, houses, papers or effects. *Soldal,* —— U.S. at —— n. 7, 113 S.Ct. at 544 n. 7; *Oliver,* 466 U.S. at 176–77, 104 S.Ct. at 1740.

warrants are such that the items could be, and probably would be, kept inside the video poker machines.

Alternatively, the Government argues that Duffy Conley's expectation of privacy is not one that society is willing to recognize as reasonable because the expectation of privacy is asserted in the means and instrumentalities of crime.

(e) The Court's Analysis

■ First, the Government errs in contending that Duffy Conley has conceded an inability to challenge the seizure of the poker machines. Duffy Conley has conceded that he had no reasonable expectation of privacy in premises on which the machines were located and the machines were clearly in plain view. His ownership of and possessory interests in the machines themselves and their contents nonetheless remain protected by the Fourth Amendment. *Dickerson*, —— U.S. at ——, 113 S.Ct. at 2135; *Soldal*, —— U.S. at ——, 113 S.Ct. at 544; *Horton*, 496 U.S. at 136–37, 110 S.Ct. at 2307–08; *Jacobsen*, 466 U.S. at 113, 104 S.Ct. at 1656. At the time of the seizure, therefore, the police had to have had probable cause to seize the machines as the fruits, instrumentalities, or evidence of a crime, or contraband.[7] *Soldal*, —— U.S. at ——, 113 S.Ct. at 544; *Horton*, 496 U.S. at 136–37, 110 S.Ct. at 2307–08; *United States v. Benish*, 5 F.3d 20, 25 (3d Cir.1993).

■ Second, the government's contention that the *capias* clauses of the warrants authorized the search of the machine compartments is ill-conceived as a challenge to Duffy Conley's reasonable expectations of privacy within the machines. Reasoning backwards, if the *sole* justification for the searches of the compartments of the video poker machines is the warrants, Duffy Conley surely can challenge the issuance, adequacy and execution of the warrants. The *need* for the warrant to *search* arises only from his reasonable expectation of privacy. *See Jacobsen*, 466 U.S. at 113, 104 S.Ct. at 1656. While there is language in *Rawlings* that may be read to mean that a lawful search never invades a legitimate expectation of privacy,[8] subsequent cases make clear that reasonable expectations of privacy are not obliterated, but merely overridden, by a magistrate's lawful authorization of an invasion of such expectations. *Soldal*, —— U.S. at ——, 113 S.Ct. at 543; *Skinner*, 489 U.S. at 616–19, 109 S.Ct. at 1412–14; *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989).

■ Third, the Court holds that Duffy Conley has established a reasonable expectation of privacy in the compartments of the seized poker machines, notwithstanding the Government's contention that there can be no reasonable expectation of privacy in the compartments because the machines were the instrumentalities of crime. Duffy Conley had a subjective expectation of privacy. Duffy Conley has established that the upper and lower compartments of the poker machines, which he owns, are *areas* over which he exercises dominion and control, including the right of exclusion as to the public and the government. *See United States v. Acosta*, 965 F.2d 1248, 1256–57 (3d Cir.1993) (property interests are still relevant to privacy interests). Though he has granted certain Duffy Vending employees access to both the upper and lower compartments and has granted the location operators access to the lower compartments, such access is limited to few persons and circumscribed in purpose. More-

---

7. The Court presumes that the Government will attempt to show probable cause to seize the machines through the warrants that were in fact issued for the eighty locations.

8. "Prior to *Rakas*, petitioner might have been given 'standing' in such a case to challenge a 'search' that netted those drugs but probably would have lost his claim on the merits. After *Rakas, the two inquiries merge into one:* whether governmental officials violated any legitimate expectation of privacy held by petitioner." *Rawlings*, 448 U.S. at 106, 100 S.Ct. at 2562. This "merger" statement could be read as meaning, in light of *Katz* and *Rakas*, that a lawful search never invades a legitimate expectation of privacy. This implication of the majority's opinion in *Rawlings* led Justice Blackmun to concur separately to urge that reasonable expectations of privacy are analytically distinct from the lawfulness of governmental invasions of such expectations. *Rawlings*, 448 U.S. at 111–12, 100 S.Ct. at 2564–65 (Blackmun, J., concurring).

over, the granting of such access is an affirmative exercise of dominion over the areas. *Cf. Acosta,* 965 F.2d at 1258.

██ The compartments are containers that do not reveal to plain view their contents. Society accepts as reasonable expectations of privacy in such containers, even when the containers themselves are in plain view in public. *See Horton,* 496 U.S. at 141 n. 11, 110 S.Ct. at 2310 n. 11; *Smith v. Ohio,* 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990); *Jacobsen,* 466 U.S. at 114 & n. 8, 104 S.Ct. at 1657 & n. 8; *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983); *Arkansas v. Sanders,* 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979), *overruled on other grounds, California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *United States v. Chadwick,* 433 U.S. 1, 13 & n. 8, 97 S.Ct. 2476, 2485 & n. 8, 53 L.Ed.2d 538 (1977), *overruled on other grounds, California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *United States v. Van Leeuwen,* 397 U.S. 249, 251, 90 S.Ct. 1029, 1031, 25 L.Ed.2d 282 (1970); *Ex parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1878).

The Government relies on *Jacobsen* as establishing that there can be no reasonable expectation of privacy in the instrumentalities of crime. This Court finds *Jacobsen* distinguishable.

In *Jacobsen,* Federal Express employees opened and searched the defendant's package, found what they believed to be cocaine, and called in federal agents. Before the agents arrived, however, the employees reassembled the package. Although the employees' initial search destroyed some of the packaging, the reassembled package concealed from plain view the drugs within it. The agent removed the package's contents from the packaging and examined them. Ultimately, the agent conducted a field test, which showed the contents to be cocaine.

The Court stated, "Congress has decided—and there is no question about its power to do so—to treat the interest in 'privately' possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably

'private' fact, compromises no legitimate privacy interest." *Jacobsen,* 466 U.S. at 123, 104 S.Ct. at 1661; *cf. Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 554–56, 105 S.Ct. 1005, 1019–20, 83 L.Ed.2d 1016 (1985); *Katzenback v. Morgan,* 384 U.S. 641, 651 & n. 10, 86 S.Ct. 1717, 1724 & n. 10, 16 L.Ed.2d 828 (1966). Nonetheless, *Jacobsen 's* rationale is quite limited, and has been treated as such. *See Skinner,* 489 U.S. at 626, 109 S.Ct. at 1418 (citing *Jacobsen* in finding a particular *search* to be a *limited* invasion of protected privacy).

The Court did not focus on the legislative power to outlaw certain items in finding that the government conducted no "search." Rather, the Court emphasized that the prior private search had destroyed any expectation of privacy in the package, *Jacobsen,* 466 U.S. at 119, 104 S.Ct. at 1659, there was a "virtual certainty" that the package contained *only* contraband, *id.,* and the field test could reveal no more than whether or not the contents of the package were cocaine. *Id.* at 123–24, 104 S.Ct. at 1661–62. There are no facts in this record to bring the eighty searches in question within this very limited doctrine.

To the extent that the Government relies on the "distinctive character" of the seized poker machines to defeat an otherwise reasonable expectation of privacy, *Jacobsen* does not support the government's position. *Jacobsen* relied on "distinctive character" only in finding that probable cause existed to *seize* under an exception to the warrant requirement. *Id.* at 121, 104 S.Ct. at 1660; *see also id.* at 120 n. 17, 104 S.Ct. at 1660 n. 17 (reaffirming warrant requirement for closed containers). Acceptance of the Government's contention that there can be no expectation of privacy for instrumentalities would be inconsistent with the longstanding warrant requirement for closed containers, *see Ex parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1878), with respect to fruits, instrumentalities, contraband, and, perhaps, mere evidence. Probable cause to seize a container believed to contain contraband, for instance, would establish probable cause to believe that the container concealing the contraband was an instrumentality of the offense.

■ The Government's contention fails for another, independent reason. "The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred." *Id.* at 115, 104 S.Ct. at 1657. The record with respect to "standing" reveals much about the nature and operation of video poker machines. For instance, the Government demonstrated that when certain functions are used, the *per se* illegality of the video poker machines is revealed on the video display monitor. The Government argues that these capabilities of the machines renders the machines metaphysically transparent to inspection. Yet, there is no evidence in the current record that such functions were on display at the time of the searches, that they were previously displayed to the officers or even members of the public. Most, if not all, of the Government's evidence regarding "standing" was *ex post facto* evidence. Discoveries in the course of the questioned police conduct cannot be used to justify a search or seizure or to defeat constitutionally protected expectations.

Duffy Conley has established that his own Fourth Amendment rights were implicated in the searches of the eighty locations and the seizures of his video poker machines. The Court, unfortunately, is bound to address the reasonableness of each of the searches and seizures regarding which Duffy Conley raises contentions.

### (iii) *Conclusions of Law*

15. Duffy Conley had ownership and possessory interests in the video poker machines seized at the eighty locations on September 23, 1988, which interests are protected by the Fourth Amendment.

16. Duffy Conley had reasonable expectations of privacy in the inner compartments of the video poker machines seized at the eighty locations on September 23, 1988 and subsequently searched, which expectations are protected by the Fourth Amendment.

### (B) *Reasonable Expectations of Privacy in 930 Saw Mill Run*

#### (i) *Findings of Fact*

17. The Court has previously made findings of fact regarding the reasonable expectations of privacy of Defendants Duffy Conley, Curtin, Jack Conley, and Sheila Smith in 930 Saw Mill Run on September 23, 1988. *United States v. Conley*, 813 F.Supp. 372, 376–77 (W.D.Pa.), *rev'd on other grounds*, 4 F.3d 1200 (3d Cir.1993).

#### (ii) *Conclusions of Law*

18. Defendants John F. "Duffy" Conley, Jr., John Francis "Jack" Conley and Sheila F. Smith had reasonable expectations of privacy in the premises of 930 Saw Mill Run Boulevard. William C. Curtin lacked a reasonable expectation of privacy in those premises. *Id.* at 377–78.

### II. The Merits

### (A) *The Issuance of Search Warrants on September 22, 1988*

#### (i) *Finding of Fact*

19. On September 21, 1988, Trooper William Cunningham of the Pennsylvania State Police contacted District Justice Anne Marie Scharding and informed her that a "bunch" of warrants would be submitted for her review the following morning.

20. The District Justice had been a district justice for approximately six years by 1988. Prior to that, she had been her predecessor's secretary for twelve years. As a district justice, she had reviewed an average of five search warrant applications a week.

21. On September 22, 1988, three Pennsylvania State Troopers, Trooper Cunningham, Trooper Joseph Rozum and Trooper Mary Beth Shearer/Hostert, went to the District Justice's offices with 55 search warrant applications. The troopers arrived at the District Justice's office prior to 8:00 a.m., before the District Justice's secretaries arrived to open the offices.

22. The District Justice's secretaries arrived a short time after 8:00 a.m. and allowed the troopers to enter the offices. The troopers showed their warrant applications to the secretaries.

23. Each of the 55 warrant applications was in its own package consisting of a letter size manila folder with a warrant application form, a receipt inventory form, six copies of the affidavit of probable cause, and photos of

the location to be searched. The manila folders were filed in two cardboard boxes.

24. The warrant application forms were standard Pennsylvania search warrant forms, which consist of an original and five copies. The affidavit of probable cause was not typed on the limited space provided within each warrant application form. Rather, the affidavit of probable cause was typed on additional pages attached to the warrant application form. The six copies of each affidavit of probable cause corresponded to the original and five copies of the search warrant contained in the warrant application form.

25. The secretaries, concerned by the volume of search warrant applications, telephoned the District Justice at her home. She instructed them to begin typing general information on the warrants, *e.g.*, her name, address and authority. Further, she instructed her secretaries to select a time in mid-morning and type the time on all of the warrants as the time of issuance. The secretaries selected 11:00 a.m. as the time of issuance. The secretaries began to type the information onto the warrant application forms.

26. The District Justice arrived at her offices about 8:40 a.m. She immediately went into her courtroom, which was at the rear of her offices, behind the reception area and her chambers. The troopers had then been located in the courtroom as well.

27. The District Justice found the number of warrants to be unusual; she had never been tendered that many warrants at once. She was "absolutely not prepared" for the number of warrants. She began her review of the 55 search warrant applications at about 9:15 a.m. and finished it at about 12:30 p.m. Once she began reviewing the warrants, the District Justice continued without interruption until all 55 warrants were issued.

28. Due to the number of warrant applications, an assembly line was set up to process the warrant applications. The District Justice, her secretaries, and the three troopers participated in warrant processing.

29. The District Justice's secretaries worked at the typewriters in the reception area. There, they typed the District Justice's information onto the warrants, including the 11:00 a.m. time of issuance. After typing on the front of warrant application forms, they reversed the five carbons between the six copies to type on the back of warrant application forms. They also affixed the District Justice's commission expiration stamp eight times on each of the 55 search warrant application—wherever the magistrate was to sign.

30. Trooper Rozum conveyed the partially completed warrants from the secretaries in the reception area down the public hallway to the courtroom. When Trooper Rozum was not conveying warrants from the secretaries to the District Justice, he was in the courtroom affixing the District Justice's raised seal on the warrant application forms wherever the District Justice had signed. Trooper Rozum had to affix the District Justice's seal eight times on each of the 55 warrant applications—a total of 440 times.

31. Trooper Shearer/Hostert sat at counsel table in the courtroom with the District Justice and Trooper Cunningham. She reversed the carbons between the copies of each warrant application form after the District Justice and Trooper Cunningham had signed in the appropriate places on the back of the form. The carbons were then situate in their original position.

32. Trooper Cunningham was reviewing and signing search warrant applications at counsel table in the courtroom. He had to sign each warrant seven times—a total of 385 times.

33. The District Justice was also reviewing and signing search warrant applications at counsel table in the courtroom.

34. The first eight pages of each affidavit of probable cause for all of the 55 state warrants were identical. They contained information regarding the affiant and the operation of gambling devices. In addition to the "background" information contained in the first eight pages, each affidavit of probable cause contained information specific to the location to be searched. The location-specific information was contained in one to three

pages. The conclusion paragraph on each affidavit was also identical.

35. The District Justice read the first search warrant application in its entirety. Upon commencing review of the second search warrant application, she realized that the "background" information was identical to that contained in the first search warrant application. Furthermore, Trooper Cunningham informed her that the first eight pages were identical and the pages following the first eight detailed the information unique to each location.

36. The District Justice asked Trooper Cunningham if the first eight pages were necessary, stating that she knew what was a gambling device. Trooper Cunningham informed her that the first eight pages were necessary to probable cause.

37. After reading the first search warrant application in its entirety, the District Justice employed a different procedure in reviewing the remaining 54 search warrant applications. She compared the photographs with the description of the place to be searched, scanned the first eight pages to determine if they were identical to the eight pages she read for the first package, read the location-specific averments, and scanned the remaining five copies of the affidavit of probable cause to ensure that they conformed to the one that she read for that search warrant application.

38. Although it was her general practice to inscribe her initials at the bottom of each page of an affidavit of probable cause, she did not follow her practice in issuing the 55 state warrants during the morning of September 22, 1988. Likewise, it was her normal practice to correct typographical errors, but she failed to recognize and correct numerous typographical errors contained in the search warrant applications, e.g., the time of issuance being listed as "11:00 p.m."

39. The District Justice read the location-specific pages in at least one affidavit of probable cause for each of the 55 search warrant applications—approximately 110 to 165 pages of specific information. The District Justice signed each of the 55 search

warrant applications eight times—a total of 440 times.

40. The District Justice administered the oath to Trooper Cunningham with respect to the first search warrant application. After reviewing and signing the remaining 54 search warrant applications, the District Justice placed her hand on the two boxes in which the signed search warrant applications had been refiled and once administered the oath to Trooper Cunningham with respect to all of the search warrant applications in the boxes.

41. At approximately 12:30 p.m., the District Justice took an hour for lunch.

42. When the District Justice returned from lunch, Detective John Bosetti of the City of Pittsburgh Police arrived with 47 search warrant applications.

43. The warrant form used by the City of Pittsburgh has only one copy and is a much simpler form.

44. The affidavit of probable cause for the city warrants was set forth on separate sheets attached to the warrant application, rather than contained in the space provided on the search warrant application form. Like the state affidavits, the city affidavits contained a number of identical "background" pages followed by pages setting forth information specific to the location to be searched.

45. At the outset, the District Justice placed her hand on the city search warrant applications and once administered the oath to Detective Bosetti as to all the warrants.

46. The District Justice read the first city search warrant application in its entirety. After reading it, she advised Detective Bosetti that she would not sign the warrant until he added a line at the end of the affidavit stating that he requested the issuance of a search warrant. Detective Bosetti used one of the District Justice's typewriters in the reception area to add such a line to each of the city search warrant applications.

47. Upon reading the second city search warrant application, the District Justice realized that there were "background" pages

identical to those in the first city search warrant application. She then reviewed the city search warrant applications using a procedure similar to that employed regarding the state search warrant applications: She skimmed the "background" pages to determine that they were identical to the first city search warrant application; she read the location-specific pages of each city search warrant application.

48. The review of the forty-seven city search warrant applications started immediately after lunch and continued until approximately 5:30 p.m.

49. In issuing the state and city search warrants, the District Justice exercised her individual judicial discretion.

### (ii) *Discussion*

■■■ Duffy Conley contends that the District Justice abdicated her neutral and detached role and acted as a rubber stamp for the police. Specifically, he contends that the District Justice did not read, and could not have read, the affidavits of probable cause before issuing the search warrants.[9]

■■■ Absent a valid exception to the warrant requirement, the determination of probable cause must be made by a magistrate, not the police. *See Minnesota v. Dickerson,* —— U.S. ——, ——, 113 S.Ct. 2130, 2135, 124 L.Ed.2d 334 (1993); *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–369, 92 L.Ed. 436 (1948). The magistrate must make an independent, judicial determination that probable cause exists in the affidavit, and must not act as a "rubber stamp" for the police. *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964); *McDonald v. United States,* 335 U.S. 451, 455, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). The neutrality of a magistrate may be destroyed by very close association with the police, shading into active participation in law enforcement. *Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 326–27, 99 S.Ct. 2319, 2324, 60 L.Ed.2d 920 (1979); *Shadwick v. City of Tampa,* 407 U.S. 345, 350, 92 S.Ct. 2119, 2122, 32 L.Ed.2d 783 (1972); *Coolidge v. New Hampshire,* 403 U.S. 443, 449–53, 91 S.Ct. 2022, 2029–30, 29 L.Ed.2d 564 (1971); *United States v. McKneely,* 6 F.3d 1447, 1455–56 (10th Cir.1993); *United States v. Whitehorn,* 829 F.2d 1225, 1232–33 (2d Cir.

---

9. Pennsylvania state authorities attempted to prosecute Defendants Duffy Conley and William C. Curtin on the basis of the evidence seized pursuant to warrants issued on September 22, 1988 and September 23, 1988 and executed on September 23, 1988. The trial court suppressed the evidence seized pursuant to the warrants issued on September 22, 1988, finding that the District Justice did not read all the pages of each search warrant application, did not read every affidavit of probable cause, and failed to read the location-specific sections of some of the affidavits of probable cause.

The Superior Court of Pennsylvania affirmed the suppression order on a narrower basis. *Commonwealth v. Curtin,* 427 Pa.Super. 224, 628 A.2d 1132 (1993). The court held that the District Justice would *not* have abdicated her duty by skimming the "background" portions of the affidavits of probable cause after reading the first one in its entirety and then reading the location-specific pages in each application. The court reasoned that such a procedure would have adequately made the District Justice aware of the contents of the search warrant applications. 427 Pa.Super. at 232, 628 A.2d at 1136. On the District Justice's own conflicting testimony in the record before it, however, the court was duty-bound to accept the trial court's finding that the District Justice failed to read some of the loca-

tion-specific pages of the affidavits of probable cause. 427 Pa.Super. at 235 & n. 4, 628 A.2d at 1137 & n. 4.

In contrast, this Court is duty-bound to independently find facts and apply the law in deciding whether state officials complied with federal constitutional standards. The Supreme Court has stated:

 ... [W]e hold that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial. In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.

*Elkins v. United States,* 364 U.S. 206, 223–24, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960). The record made by the Government in this case is not identical to the record made by Pennsylvania authorities in *Curtin.*

1987), *cert. denied,* 487 U.S. 1237, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988); *United States v. Bowers,* 828 F.2d 1169, 1173–77 (6th Cir. 1986), *cert. denied,* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988). A magistrate's issuing a warrant without reading the affidavit of probable cause demonstrates a failure to act in a neutral and detached manner. *United States v. Decker,* 956 F.2d 773, 777 (8th Cir.1992).[10]

 On the record before this Court, the court has found that the District Justice read the "background" information contained in the morning and afternoon sets of search warrant applications once. The Court has also found that the District Justice read the location-specific information for each individual warrant at least once and in fact exercised her judicial discretion with respect to each warrant she signed. Therefore, Defendant Duffy Conley's argument that, by failing to read the applications, the District Justice abdicated her constitutional duty must fail. Given that the District Justice exercised her own judicial discretion in deciding whether to issue the warrants, her close cooperation with the police in the processing of the warrants does not rise to the level of complete abandonment of her neutral role as a magistrate and participation in law enforcement as condemned in *Lo–Ji Sales.*[11]

### (iii) *Conclusions of Law*

50. The District Justice did not abandon her role as a neutral and detached magistrate in issuing search warrants on September 22, 1993.

---

**10.** A magistrate may fail to be neutral and detached for other reasons, such as financial interest and personal bias, as well. *See United States v. Heffington,* 952 F.2d 275, 277–80 (9th Cir. 1991). No such other reasons are implicated by the record in this case.

**11.** Because the Court has found that the District Justice did read the appropriate sections of the search warrant applications, the Court need not address the applicability of *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) to a magistrate's failure to read affidavits of probable cause, an issue upon which there is a split among the circuits. *Compare United States v. Decker,* 956 F.2d 773, 778 (8th Cir.1992); *with United States v. Breckenridge,* 782 F.2d 1317, 1321–22 & n. 2 (5th Cir.), *cert. denied,* 479 U.S. 837, 107 S.Ct. 136, 93 L.Ed.2d 79 (1986).

(B) *Material Omissions from the September 23, 1988 Search Warrant Application for 930 Saw Mill Run* [12]

#### (i) *Findings of Fact*

##### (a) The Existence of 3100 Windgap Road

51. On September 23, 1988, District Justice Anne Marie Scharding issued to Detective John Bosetti of the City of Pittsburgh Police a search warrant for the premises of 930 Saw Mill Run Boulevard, Pittsburgh, Pennsylvania (the "930 Saw Mill Run premises"). Detective Bosetti was the affiant on the search warrant application.

52. In September 1988, Duffy Vending Co. maintained, in addition to its 930 Saw Mill Run location, a location at 3100 Windgap Road, Pittsburgh, Pennsylvania.

53. Detective Bosetti had actual knowledge of the existence of the Duffy Vending Co. location at 3100 Windgap Road on September 23, 1988, when he presented the search warrant application for the 930 Saw Mill Run premises to the District Justice. On the afternoon of September 22, 1988, the District Justice had issued a search warrant for the Windgap premises at Detective Bosetti's request.

54. Despite his knowledge of it, Detective Bosetti failed to include the existence of the Windgap premises in the search warrant application for the 930 Saw Mill Run premises.

##### (b) Date of Conduct underlying Prior Conviction

55. The search warrant application states that Duffy Conley was convicted of violating

---

**12.** The question of material omissions from the search warrant application for 930 Saw Mill Run Boulevard is an issue that this Court has yet to address. *See Conley,* 813 F.Supp. at 387 n. 10; *supra* note 1. Although the issue was raised in the Court of Appeals, *see* Brief of Appellee Sheila F. Smith, 15–18, it is unclear on the face of the Court of Appeals' Opinion whether the Court of Appeals disposed of the issue. *See Conley,* 4 F.3d at 1208 n. 7 ("... we do not suggest that the affidavit in this case involves any material omission or misrepresentation"). As this Court's independent analysis finds no material omission or misrepresentation, any error in the Court's addressing the issue is harmless.

18 Pa.Cons.Stat.Ann. § 5513 on March 16, 1988. The search warrant application makes no representation regarding the date of the underlying activities.

56. The activities underlying Duffy Conley's March 16, 1988 conviction occurred more that twelve months prior to his March 16, 1988 conviction, and more than eighteen months before the application and affidavit of probable cause for search warrant was presented to the District Justice.

57. Detective Bosetti was personally aware that Duffy Conley's conduct underlying his March 16, 1988 conviction occurred over one year prior to the conviction and eighteen months prior to September 23, 1988.

58. Detective Bosetti knew that the date of Duffy Conley's conduct was not as useful as the date of conviction in securing a search warrant because the date of the conduct was more remote in time.

### (c) Date of Applications for Permits then on Current Display

59. This Court has previously found facts relative to omission of the date of applications for the City of Pittsburgh vending permits on current display at pay-off locations June of 1988. *Conley*, 813 F.Supp. at 380, ¶¶ 49–52.

### (ii) *Discussion*

### (a) The Applicable Law

■■■■ Where a neutral and detached magistrate issues a search warrant on the basis of an affidavit containing intentional or reckless false statements, or material omissions, *United States v. Calisto*, 838 F.2d 711, 714–16 (3d Cir.1988); *United States v. Pace*, 898 F.2d 1218, 1232 (7th Cir.), *cert denied*, 498 U.S. 878, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990), probable cause must be determined on the basis of an hypothetical affidavit that "reads" as though it did not contain the false statements and did contain the omitted material information. *See Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978); *United States v. Harvey*, 2 F.3d 1318, 1323–24 (3d Cir.1993); *Calisto*, 838 F.2d at 714–16; *Pace*, 898 F.2d at 1232. The improper averments must also be material in that it reasonably could have affected the magistrate's judgment in finding probable cause. *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir.1990). In order for a challenge to a warrant to go forward on the basis of a deliberate falsehood or a material omission, the challenger must at least proffer evidence demonstrating the falsity of an averment or the truth of omitted facts. *Harvey*, 2 F.3d at 1324.

### (b) The Existence of 3100 Windgap Road

The affidavit's failure to include the existence of the Duffy Vending Co. location at 3100 Windgap Road was not a material omission. Including the existence of Duffy Vending operations at the Windgap premises in the affidavit, a substantial basis to conclude that evidence of the gambling activity described in the affidavit may be found on the 930 Saw Mill Run premises remains.

■■■ In a situation in which police are seeking a particular item of evidence, such as a gun or stolen property, the existence of an additional potential location may halve the common-sense probability that the item will be found at the location to be searched. In contrast, the existence of operations at the Windgap premises does not halve the likelihood that evidence of gambling may be found on the 930 Saw Mill Run premises. Indeed, it does not materially affect the common-sense probability that evidence of gambling may be found on the 930 Saw Mill Run premises. Given the range of evidence relevant to gambling, it likely that evidence could be found at both locations.

### (c) Date of Conduct underlying Prior Conviction

■■■■ "The use of prior arrests and convictions is not only permissible, ... but is often useful. This is especially so where, as in the matter presently before the court, the previous arrest or conviction involves a crime of the same general nature as the one which the warrant is seeking to uncover." *United States v. Conley*, 4 F.3d 1200, 1207 (3d Cir. 1993). The date of Duffy Conley's conviction was disclosed and no averment regarding the date of the offense was given. No deliberate falsehood was included in the affidavit. Clearly, the magistrate has to assume that

the underlying conduct occurred some time, perhaps a substantial time, before the date of conviction.

Assuming *arguendo* that there was an omission regarding the date of the underlying conduct, it was not material. Duffy Conley's March 16, 1988 conviction was for "exactly the same conduct of illegal pay-offs through the use of video poker machines as was being investigated at the time the affidavit was written." *Id.* at 1206. The lapse of eighteen months between the conduct underlying the conviction and the issuance of the warrant would not significantly alter the probative force of Duffy Conley's prior conviction.

(d) Date of Applications for Permits then on Current Display

▉▉▉▉ The affidavit's failure to disclose that the permits on display at the gambling locations were based on applications filed in 1987 was not a material omission. With such information included, a substantial basis to conclude that Duffy Vending Co. owned the video poker machines at 42 of the 49 locations on September 23, 1988 remains. *See Conley*, 813 F.Supp. at 382, ¶¶ 62–63.

(iii) *Conclusions of Law*

60. There were no material omissions from the September 23, 1988 search warrant application for the 930 Saw Mill Run premises.

(C) *The Execution of the Search Warrant for 930 Saw Mill Run on September 23, 1988*

(i) *Findings of Fact* [13]

61. In September 1988, 930 Saw Mill Run Boulevard was a two-story, brown-brick building located between a gasoline station and a salt or cinder pile in a strip of commercial properties. The words "Conley Motor Freight" were painted on the outside of the building.

62. The building had two entrances, one facing the street and one in the rear of the building. The front door could be unlocked from the outside, and the first floor office space could be accessed by the use of second key. The back entrance consisted of a storm door and an inner door. The back entrance could not be unlocked from the outside.

63. "No trespassing" signs were posted in the front door, the back door and a window on the right side of the building (viewed from the street). Persons seeking to enter the Saw Mill Run premises were directed by a sign to the back entrance.

64. Inside the back doors was a storage room. Beyond the storage room, through another doorway, was the first-floor office space. The second story also contained office space.

65. Defendant John Francis "Jack" Conley ("Jack Conley"), Duffy Conley's father, owned the real estate and building comprising the 930 Saw Mill Run premises.

66. Two businesses occupied the 930 Saw Mill Run premises: Conley Motor Freight, a steel hauling and trucking business; and Duffy Vending Company ("Duffy Vending"), a vending company.

67. Jack Conley owned Conley Motor Freight. He had two employees. One worked in the first-floor office space, and the other worked in a garage in the same building. Six or seven independent truckers were associated with Conley Motor Freight. They each made an average of two visits per week to the Saw Mill Run premises.

68. Jack Conley maintained a desk in the first floor office space of the Saw Mill Run premises, situated near the right-side window to afford him a view of persons entering and exiting the Saw Mill Run premises.

69. Jack Conley worked at the Saw Mill Run premises on a daily basis, spending a

---

**13.** As stated above, ¶¶ 17–18, the Court has previously made findings of fact and conclusions of law finding that Defendants Duffy Conley, Sheila F. Smith and John Francis "Jack" Conley had reasonable expectations of privacy in the 930 Saw Mill Run premises. Paragraphs 61–78 of these findings of fact regarding the execution of the September 23, 1988 warrant for the 930 Saw Mill Run premises constitute a partial reiteration of the Court's previous findings of fact. The reiterated findings of fact are relevant to the issue of execution, and are set forth again for clarity's sake.

considerable amount of time there each week.

70. Conley Motor Freight's business at the Saw Mill Run premises was conducted by telephones registered to Conley Motor Freight. Conley Motor Freight did not solicit walk-in business at the Saw Mill Run premises in any manner.

71. Duffy Conley owned Duffy Vending. Defendants Sheila F. Smith and William C. Curtin were employees of Duffy Vending. Defendant Sheila Smith and one Helen Grosskopf worked at the Saw Mill Run premises as full-time secretaries.

72. Duffy Conley, as owner of Duffy Vending, maintained operational control over its business and records. All Duffy Vending business records were maintained at the Saw Mill Run premises.

73. Duffy Conley had a desk in the first-floor office space of the Saw Mill Run premises, in which he kept customer contracts, bills, notes and agreements. In a filing cabinet next to his desk, he kept checkbooks, canceled checks, bank statements and deposit slips.

74. Helen Grosskopf and Sheila Smith each had a desk on the Saw Mill Run premises and maintained Duffy Vending records in their desks.

75. Duffy Conley worked at the Saw Mill Run premises at least forty-five minutes a day, five days a week. He occasionally worked there on evenings and weekends. He reviewed and balanced customer accounts using all the records maintained on the Saw Mill Run premises.

76. Duffy Vending did not solicit walk-in business in any manner. No showroom existed on the Saw Mill Run premises, and customers were not invited to the Saw Mill Run premises.

77. Persons who regularly frequented the Saw Mill Run premises were limited to Jack Conley, his two employees, the independent truckers, Duffy Conley, Sheila Smith, Helen Grosskopf and Patrick Barth, a United Parcel Service driver who made deliveries an average four times a week.

78. Occasionally, other employees of Duffy Vending visited the Saw Mill Run premises, as did personal friends of Jack Conley.

79. On September 23, 1988, after Detective Bosetti secured a search warrant for the 930 Saw Mill Run premises, Detective Bosetti, Detective Daniel Quinlan, and a uniformed police officer drove to 930 Saw Mill Run. They parked at the front of 930 Saw Mill Run.

80. Detectives Bosetti and Quinlan were not in uniform. The uniformed officer, of course, was in uniform.

81. The police officers walked along the right hand side of the building, viewed from the front of the building, to reach the back door.

82. While they were walking along that side of the building, the police officers were able to see Jack Conley, and behind him, an office in operation. At the same time, Jack Conley saw Detectives Bosetti and Quinlan, in their street clothes, and the uniformed officer.

83. The officers continued past the window towards the rear of the building without indicating in any manner that they had a search warrant or sought entry on to the premises.

84. Given that the only entrance used during working hours was the back door and the officers had ample opportunity to see at least two of the three "no trespassing" signs posted on the front of the building, the side window through which they observed Jack Conley and the door through which they entered, officers could not reasonably conclude that the 930 Saw Mill Run premises was open to the public.

85. The police officers reached the back door. On September 23, 1988, at the time the officers executed the search warrant for 930 Saw Mill Run, the storm door was closed, but unlocked. The inner door was open.

86. The police officers did not knock or announce their presence or authority before entering the 930 Saw Mill Run premises.

87. The police officers opened the closed, unlocked storm door and walked through the

open inner door into the 930 Saw Mill Run premises.

88. The police officers walked through the storage room, through another door, and into the first-floor office area. Once through the door and into the first-floor office area, the police officers identified themselves as police officers and announced that they were there to serve a search warrant for the premises. The police officers then showed their warrant to Jack Conley.

89. Duffy Conley was not on the 930 Saw Mill Run premises at the time the police officers commenced their search.

90. Detective Bosetti believed that he had a duty to knock and announce his presence before entering the premises.

### (ii) *Discussion*

#### (a) Choice of Law

Defendants challenge the September 23, 1988 search of 930 Saw Mill Run Boulevard because the state officers executing the warrant failed to knock and announce their presence and authority before entering the structure to execute their warrant. On various theories, it is claimed that the state officers' conduct violated Pennsylvania law governing the execution of warrants, the Pennsylvania Constitution, federal law governing the execution of warrants and the Constitution of the United States. The issue of the law governing the admissibility of this evidence is hotly disputed.

Pennsylvania's *knock and announce* requirement is embodied in Pennsylvania Rule of Criminal Procedure 2007, which provides:

**RULE 2007. MANNER OF ENTRY INTO PREMISES**

(a) A law enforcement officer executing a search warrant shall, before entry, give, or make reasonable effort to give, notice of his identity, authority and purpose to any occupant of the premises specified in the warrant, unless exigent circumstances require his immediate forcible entry.

(b) Such officer shall await a response for a reasonable period of time after his announcement of identity, authority and purpose, unless exigent circumstances require his immediate forcible entry.

(c) If the officer is not admitted after such reasonable period, he may forcibly enter the premises and may use as much physical force to effect entry therein as is necessary to execute the search.

Pa.R.Crim.P. 2007, 42 Pa.Cons.Stat.Ann. (Purdon 1989).

The status of state law is particularly clear in this case. The Commonwealth of Pennsylvania filed state charges against Defendants Conley and Curtin based in part upon the evidence seized in the September 23, 1988 search of 930 Saw Mill Run. The Superior Court of Pennsylvania affirmed the trial court's suppression of the evidence seized during the search of 930 Saw Mill Run on the basis of the officers' failure to knock and announce. *Commonwealth v. Curtin*, 427 Pa.Super. 224, 234–242, 628 A.2d 1132, 1137–41 (1993).

The Superior Court held that the issue presented, "whether Pennsylvania's 'knock and announce' rule is applicable to commercial structures," *id.* 628 A.2d at 1137, should be answered in the affirmative. As no circumstances excusing compliance with Pa. R.Crim.P. 2007 were shown, the court found that the executing officers' conduct implicated "fundamental constitutional concerns," requiring application of Pennsylvania's exclusionary rule. *Id.* 628 A.2d at 1141 & n. 8 (citing *Commonwealth v. Chambers*, 528 Pa. 403, 598 A.2d 539 (1991)).

■ Defendants Duffy Conley, Jack Conley and Sheila Smith urge that the Court suppress the evidence seized in the September 23, 1988 search of Saw Mill Run Boulevard because it violated their rights under the Pennsylvania knock and announce rule and constitution. The Third Circuit has held, however, that a defendants state-secured rights, constitutional or otherwise, are of no consequence when the defendant is prosecuted by the federal government. *United States v. Rickus*, 737 F.2d 360, 363–64 & n. 1 (3d Cir.1984); *United States v. Bedford*, 519 F.2d 650, 653–54 & nn. 1–3 (3d Cir.1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976); *United States v. Scolnick*, 392 F.2d 320, 323–26 (3d Cir.1967), *cert. denied*, 392 U.S. 931, 88 S.Ct. 2283, 20

L.Ed.2d 1389 (1968); *cf. United States v. Shaffer,* 520 F.2d 1369, 1372 (3d Cir.1975), *cert. denied,* 423 U.S. 1051, 96 S.Ct. 779, 46 L.Ed.2d 640 (1976); *United States v. Armocida,* 515 F.2d 49, 51–52 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). The Court of Appeals for the Third Circuit has recently applied its *Rickus* doctrine to admit evidence assumed to have been seized pursuant to a state warrant by state officers in violation of Pennsylvania's knock and announce rule. *United States v. Stiver,* 9 F.3d 298, 300 (3d Cir.1993). It is clear, therefore, that this Court cannot suppress the fruits of the September 23, 1988 search of 930 Saw Mill Run on the basis of the state officers' violation of Pennsylvania Rule of Criminal Procedure 2007 or the Pennsylvania Constitution. The Court must therefore judge the state officers' conduct solely under federal standards.

Federal law also contains a statutory knock and announce requirement. Title 18, Section 3109 provides:

### § 3109. Breaking doors or windows for entry or exit

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109 (1985). There is a split among the circuits on the issue of whether the federal statute applies to commercial premises. *Compare, e.g., United States v. Phillips,* 497 F.2d 1131 (9th Cir.1974); *United States v. Case,* 435 F.2d 766, 770 n. 1 (7th Cir.1970); *and, e.g., United States v. Lopez,* 898 F.2d 1505, 1511 (1990); *Fields v. United States,* 355 F.2d 543 (5th Cir.), *cert. dismissed,* 384 U.S. 935, 86 S.Ct. 1452, 16 L.Ed.2d 536 (1966); *see also United States v. Little,* 753 F.2d 1420 (9th Cir.1984). The Court of Appeals for the Third Circuit has yet to take a position on this issue. Failure

to comply with the federal statute results in the application of the exclusionary rule to the fruits of the entry. *United States v. Marts,* 986 F.2d 1216, 1218 (8th Cir.1993); *United States v. Nolan,* 718 F.2d 589, 596 (3d Cir. 1983); *see also Sabbath v. United States,* 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968).

Defendant Sheila F. Smith contends that the federal knock and announce statute applies to the state officers' conduct. The federal knock and announce statute, however, does not govern the execution of state warrants by state officers without federal involvement. *United States v. Stiver,* 9 F.3d 298, 300 (3d Cir.1993); *United States v. Andrus,* 775 F.2d 825, 844 (7th Cir.1985); *United States v. Bradley,* 455 F.2d 1181, 1185 n. 8 (1st Cir.1972); *United States v. Daoust,* 728 F.Supp. 41, 47 (D.Me.1989), *aff'd,* 916 F.2d 757 (1st Cir.1990).

 Because no federal statute governs the execution of state warrants by state officers without federal involvement, only the standards of the Fourth Amendment apply. *Stiver,* 9 F.3d at 300. Moreover, violation of state law is irrelevant to the federal constitutional inquiry into Fourth Amendment reasonableness. *See Greenwood,* 486 U.S. at 43–44, 108 S.Ct. at 1630–1631.

### (b) Reasonableness under Fourth Amendment Standards

 The Court of Appeal for the Third Circuit has held that strictures of the federal statutory knock and announce rule overlap with, but are not coextensive with, the Fourth Amendment's prohibition against unreasonable searches and seizures. *Stiver,* 9 F.3d at 300; *Nolan,* 718 F.2d at 600. The federal statutory provision takes the form of a "requirement with precise and narrowly drawn exceptions." *Nolan,* 718 F.2d at 601. In contrast, the Fourth Amendment mandates only a general reasonableness. *Id.* "[N]ot every violation of the statute will present … an unreasonable intrusion." *Id.* at 602.[14]

---

**14.** 930 Saw Mill Run is a commercial premises in which certain defendants had reasonable expectations of privacy. *See supra,* ¶¶ 17–18. Assuming *arguendo* that the underlying purposes of

the federal statute would justify applying it to the premises of 930 Saw Mill Run, hypothetical federal officers conducting the same search would

**1032**

■ The Court concludes that the state officers' conduct relative to the September 23, 1988 search of 930 Saw Mill Run was not unreasonable within the meaning of the Fourth Amendment. Although the officers violated Pennsylvania's knock and announce rule, and would have violated the federal knock and announce rule had they been federal officers, their conduct was not so outrageous as to offend the strictly Fourth Amendment proscription of "unreasonable" searches and seizures.

The officers entered the 930 Saw Mill Run premises by opening the closed, unlocked outer door at the rear of the building. They inflicted no damage to Jack Conley's property in doing so. The inner door was open. The officers walked through the storage room. After passing through the doorway between the storage room and the first-floor office, they announced their presence and authority.

The officers did intrude unannounced into an area in which Duffy Conley, Jack Conley and Sheila F. Smith had a reasonable expectation of privacy. Nonetheless, the intrusion was pursuant to a valid warrant. *United States v. Conley*, 4 F.3d 1200 (3d Cir.1993); *supra*, ¶ 60.

The officers entered the 930 Saw Mill Run premises during day-light, business hours. The officers did not execute the warrant in a provocative manner likely to lead to violence. Given these facts, the search was not conducted in an unreasonable manner within the meaning of the Fourth Amendment. *See United States v. Sagaribay*, 982 F.2d 906, 910 (5th Cir.), *cert. denied,* — U.S. —,

have violated the federal knock and announce statute.

It is undisputed that the officers did not knock and announce their presence and purpose before entering the 930 Saw Mill Run premises. The officers' opening of a closed, unlocked door was a "breaking" under the statute. *Sabbath v. United States*, 391 U.S. 585, 590, 88 S.Ct. 1755, 1758, 20 L.Ed.2d 828 (1968). Of the possible exceptions to the statutory requirement, *see Nolan*, 718 F.2d at 596, the Government urges only one— that the occupants' knowledge of the police's presence, authority and purpose made knocking and announcing their presence and authority a useless gesture. The record, however, supports this exception imperfectly.

114 S.Ct. 160, 126 L.Ed.2d 120 (1993); *Nolan*, 718 F.2d at 602; *cf. Stiver*, 9 F.3d at 302.

### (iii) *Conclusions of Law*

91. The state officers who executed the search warrant for 930 Saw Mill Run Boulevard on September 23, 1993 comported with the reasonableness requirements of the Fourth Amendment in entering the 930 Saw Mill Run premises without knocking and announcing their presence and authority.

### ORDER OF COURT

AND NOW this 3rd day of January, 1994, upon consideration of the Court's Memorandum Opinion of even date, it is hereby ORDERED as follows:

1. The motions to join in Defendant Jack Conley's Omnibus Pretrial Motion: Motion to Suppress Physical Evidence [1988 search of 930 Saw Mill Run], (Document No. 374, in part), filed by Defendants Garofalo (Document No. 412, in part) and Rodites (Document No. 419, in part) are DENIED;

2. Defendant Jack Conley's Omnibus Pretrial Motion: Motion to Suppress Physical Evidence [1988 search of 930 Saw Mill Run] (Document No. 374, in part) is DENIED;

3. The motions to join in Defendant Jack Conley's Omnibus Pretrial Motion: Motion to Suppress Physical Evidence [1988 searches other than of 930 Saw Mill Run], (Document No. 374, in part), filed by Defendants Garofalo (Document No. 412, in part) and Rodites (Document No. 419, in part) are DENIED;

Jack Conley saw two men in suits and a uniformed officer pass his window and head towards the back door of the premises. That fact, viewed from the perspective of the executing officers, who observed Jack Conley looking back at them, does not establish that Jack Conley knew that they were there to search the premises pursuant to a search warrant. Moreover, though they never did knock, the officers in fact announced their presence and authority once they were inside the first-floor office. It stands to reason that the officers did not view their announcement as a useless gesture. *Cf. Stiver*, 9 F.3d at 301 (finding entry constitutionally reasonable because exception to federal statute validly applied).

4. Defendant Jack Conley's Omnibus Pretrial Motion: Motion to Suppress Physical Evidence [1988 searches other than of 930 Saw Mill Run] (Document No. 374, in part) is DENIED;

5. The motions to join in the Pretrial Motions of John F. "Duffy" Conley: Motion to Suppress Physical Evidence [1988 search of 930 Saw Mill Run], (Document No. 377, in part), filed by Defendants Curtin (Document No. 423, in part), Sheila Smith (Document No. 434, in part), Jack Conley (Document No. 418, in part), McGrath (Document No. 417, in part), Abbott (Document No. 429, in part), Rossi (Document No. 438, in part), Fleagle (Document No. 407, in part), Spratt (Document No. 406, in part), Joanne Smith (Document No. 408, in part), Goodwin (Document No. 424, in part), Demino (Document No. 428, in part), Christopher Kail (Document No. 399, in part), Ciocco (Document No. 433, in part), Sukaly (Document No. 430, in part), Ferrell (Document No. 432, in part), Rodites (Document No. 419, in part), and Rusin (Document No. 414, in part) are DENIED;

6. Pretrial Motions of John F. "Duffy" Conley: Motion to Suppress Physical Evidence [1988 search of 930 Saw Mill Run] (Document No. 377, in part) is DENIED;

7. The motions to join in the Pretrial Motions of John F. "Duffy" Conley: Defendant's Motion to Suppress [9/23/88 search of Windgap], (Document No. 377, in part), filed by Defendants Curtin (Document No. 423, in part), Sheila Smith (Document No. 434, in part), Jack Conley (Document No. 418, in part), McGrath (Document No. 417, in part), Abbott (Document No. 429, in part), Rossi (Document No. 438, in part), Fleagle (Document No. 407, in part), Spratt (Document No. 406, in part), Joanne Smith (Document No. 408, in part), Goodwin (Document No. 424, in part), Demino (Document No. 428, in part), Christopher Kail (Document No. 399, in part), Ciocco (Document No. 433, in part), Sukaly (Document No. 430, in part), Ferrell (Document No. 432, in part), Rodites (Document No. 419, in part), and Rusin (Document No. 414, in part) are DENIED;

8. Pretrial Motions of John F. "Duffy" Conley: Defendant's Motion to Suppress [9/23/88 search of Windgap], (Document No. 377, in part), are DENIED AS MOOT;

9. The motions to join in the Pretrial Motions of John F. "Duffy" Conley: Defendant's Motion to Suppress [contents of machines seized in 1988 searches], (Document No. 377, in part), filed by Defendants Curtin (Document No. 423, in part), Sheila Smith (Document No. 434, in part), Jack Conley (Document No. 418, in part), McGrath (Document No. 417, in part), Abbott (Document No. 429, in part), Rossi (Document No. 438, in part), Fleagle (Document No. 407, in part), Spratt (Document No. 406, in part), Joanne Smith (Document No. 408, in part), Goodwin (Document No. 424, in part), Demino (Document No. 428, in part), Christopher Kail (Document No. 399, in part), Ciocco (Document No. 433, in part), Sukaly (Document No. 430, in part), Ferrell (Document No. 432, in part), Rodites (Document No. 419, in part), and Rusin (Document No. 414, in part) are DENIED;

10. Pretrial Motions of John F. "Duffy" Conley: Defendant's Motion to Suppress [contents of machines seized in 1988 searches] (Document No. 377, in part) SHALL REMAIN PENDING WITH FURTHER PROCEEDINGS TO BE SET BY FURTHER ORDER OF COURT;

11. The Motions to join in the Pretrial Motions of John F. "Duffy" Conley: Defendant's Motion to Suppress Telephonic Interceptions [Windgap location only], (Document No. 377, in part), filed by Defendants Curtin (Document No. 423, in part), Rossi (Document No. 438, in part), Fleagle (Document No. 407 & 427, in part), Spratt (Document No. 406 & 426, in part), Joanne Smith (Document No. 408, in part), Goodwin (Document No. 424, in part), Demino (Document No. 428, in part), Christopher Kail (Document No. 399, in part), Ciocco (Document No. 433, in part), Sukaly (Document No. 430, in part), Ferrell (Document No. 432, in part), and Rodites (Document No. 419, in part) are DENIED;

12. Pretrial Motions of John F. "Duffy" Conley: Defendant's Motion to Suppress Telephonic Interceptions [Windgap location only] (Document No. 377, in part) are DENIED AS MOOT;

13. Defendant Sheila Smith's First Supplemental Motion to Suppress Physical Evidence (930 Saw Mill Run Boulevard) (Document No. 448) is DENIED.