UNITED STATES of America

v.

John F. "Duffy" CONLEY, William C. Curtin, Sheila F. Smith, John Francis "Jack" Conley, Thomas "Bud" McGrath, Mark A. Abbott, Thomas Rossi, William Steinhart, Roberta Fleagle, Robin Spratt, Monica C. Kail, William J. Reed, Joanne T. Smith, Kenneth "Ron" Goodwin, Lawrence N. "Neudy" Demino, Sr., Christopher "Chris" Kail, Joseph A. Devita, Frank Garofalo, Thomas D. Ciocco, Michael Sukaly, Phillip M. "Mike" Ferrell, Anestos "Naz" Rodites, and William E. Rusin, Defendants.

Crim. No. 91–178.

United States District Court, W.D. Pennsylvania.

July 7, 1994.

Frederick W. Thieman, U.S. Atty. for W.D.Pa., James R. Wilson, Asst. U.S. Atty. for W.D.Pa., William D. Braun, Crim.Div., U.S. Dept. of Justice, Washington, DC, for plaintiff.

James Wymard, William Difenderfer, Anthony Mariani, Ellen Viakley, Gary Gerson, Caroline M. Roberto, Joel Johnston, Stanley Greenfield, Martha Bailor, Ray Radokovich, Carmen Martucci, Lee Markovitz, Edward J. Osterman, William Acker, Foster Stewart, Joseph Kanfoush, Carl Max Janavitz, Raymond M. Maloney, John Goodrich, Gary B. Zimmerman, Vincent Baginski, John Zagari, James Andring, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION

LEE, District Judge.

Before the Court is Defendant John F. "Duffy" Conley's challenge to the July 19,

1990 searches of certain premises. (Document No. 377, in part).

Defendant John F. "Duffy" Conley ("Duffy Conley") has limited standing to challenge the warrants pursuant to which the July 1990 searches and seizures were undertaken. In prior proceedings, the Court ruled that Duffy Conley had Fourth Amendment interests that were implicated by seizures and searches of video poker machines from "locations"—bars, delicatessens, coffee shops, etc.—in which Duffy Conley had no reasonable expectation of privacy. *United States v. Conley*, 856 F.Supp. 1010, 1014–1022 (W.D.Pa.1994) (Document No. 801). Specifically, the Court held that Duffy Conley's ownership of the video poker machines, which the Court assumed for purposes of its decision, was an interest protected from unreasonable seizures by the Fourth Amendment. *Id.* at 1019, 1020–1022. The Court indicated that although the Fourth Amendment does not require a warrant to seize property in an unprotected area, it does require probable cause to seize without a warrant. *Id.* at 1020. Further, the Court held that Duffy Conley had a reasonable expectation of privacy in the inside compartments of the video poker machines, *id.* at 16, 19–22, 23–24, necessitating a valid warrant or warrant-exception before the compartments properly could be invaded by law enforcement personnel. *See also United States v. Conley*, 856 F.Supp. 1034, 1036 (W.D.Pa. 1994) (Document No. 900). Duffy Conley's "standing" is limited; to the extent that the searches and seizures did not involve his poker machines, they implicated no right secured to him under the Fourth Amendment.[1]

Although the Court indicated that no warrant was needed to seize video poker machines, the Court presumed that the Government would attempt to show probable cause to seize the machines through the warrants that were in fact issued for the locations. *Conley*, 856 F.Supp. at 1019 & n. 7 (W.D.Pa. 1994) (Document No. 801). As in the past, the Government has relied solely on the warrants that were in fact issued for the locations searched in 1990.

All of the searches and seizures on July 19, 1990 were conducted pursuant to warrants issued on the basis of a single master affidavit. As the affiant on the master affidavit was FBI Special Agent Charles Duffy ("S.A. Duffy"), and there are other master affidavits in the record, the July 18, 1990 master affidavit will be referred to as the "Duffy affidavit."

## THE DUFFY AFFIDAVIT

The Duffy affidavit commences by stating its objective as follows: "The purpose of this Affidavit is to establish probable cause to believe that a number of business establishments operating in and around the City of Pittsburgh are presently operating video poker machines, in violation of the Gambling Device Act, 15 U.S.C. §§ 1171, 1172, 1173, 1177 and 18 U.S.C. § 2." Duffy affidavit, at 1. After describing his credentials and the sources of his evidence, S.A. Duffy turns to a discussion of several of the federal statutes invoked by the applications for search warrants.

The Duffy affidavit quotes 15 U.S.C. § 1172, which provides in pertinent part:

§ 1172 Transportation of gambling devices as unlawful; exceptions; authority of Federal Trade Commission

(a) General rule

It shall be unlawful knowingly to transport any gambling device to any place in a State or possession of the United States from any place outside of such State or possession: ....

15 U.S.C. § 1172.[2] The Duffy affidavit then quotes Section 1171, which defines "gambling

---

1. Pursuant to Document No. 826, Duffy Conley is in essence stipulated to have owned the video poker machines at less than all the locations searched on July 19, 1990. The locations from which his video poker machines were seized are: Kail's Coffee Shop, GOV'T W–33; Idlewood Inn, GOV'T 103; The Coffee Shop, GOV'T 81; Jack's Restaurant, GOV'T W–32; and Matrix Company, GOV'T W–34.

2. *The Duffy affidavit, in what the Court can only conclude is an immaterial typographical error, misquotes the heading of the statute as indicating*

device" in the related statutory scheme, and describes the origins of "The Erie Cases."

The Duffy affidavit relates the application for and issuance of warrants which resulted in the seizure of 294 video poker machines in Erie, Pennsylvania. The Duffy affidavit then discusses the two district court opinions that resulted from the civil forfeiture cases instituted against the seized video poker machines.[3] The Duffy affidavit quotes extensively from the first of the opinions, authored by Judge Weber. The first quoted portion describes the operation of video poker machines meeting the definition of "gambling device" under Section 1171.[4] The quoted portion describes the use of knock-off switches, which remove accumulated credits upon which pay-offs have been made. The Duffy affidavit then quotes Judge Weber's holding as to what poker machines meet the definition of "gambling device" under Section 1171:

> We, therefore, conclude that all subject video poker machines with knock-off switches and meters, *or the provision* in wiring, circuitry or programming to accommodate the addition of knock-off switches and meters, are gambling devices within the meaning of the Act.

Duffy affidavit, at 6 (quoting *294 Various Gambling Devices*, 718 F.Supp. at 1246). The Duffy affidavit further states:

> 4. The Court also held that since video poker machines were gambling devices *per se*, it was not necessary to show actual payoffs on the machines.

> Evidence of actual payoffs, either directly by the machine or indirectly by a bartender who redeems credits for cash is not necessary to a determination that a machine is a gambling device.

Duffy affidavit, at 7 (quoting *294 Various Gambling Devices*, 718 F.Supp. at 1242). The Duffy affidavit also quoted the second opinion, which was authored by Judge Cohill, and included a copy of the slip opinion. The

Duffy affidavit stated that Judge Cohill "held that video poker machines are in violation of 15 U.S.C. § 1171 if they are 'designed and manufactured to facilitate gambling.' " Duffy affidavit, at 7 (quoting *294 Various Gambling Devices*, 731 F.Supp. at 1248) (emphasis deleted by S.A. Duffy).

S.A. Duffy further recites that he is personally familiar with the operation of video poker machines. In describing how such machines operate, S.A. Duffy specifically referenced the knocking off of credits, stating, "The bartender or owner, having verified the number of free games pays the player, then removes (knocks off) the accumulated credits, returning the machine to zero credits." Duffy affidavit, at 8.

The Duffy affidavit then states:

> 8. I am personally familiar with each address listed herein and know from personal observation and from speaking with agents and officers involved in the investigation that there is a business conducted at each said address. Furthermore, from these discussions and/or from personal knowledge, I have reason to believe that there is located in each identified business establishment one or more gambling devices in the form of video poker machines as more fully described herein.

> 9. Through the investigation referred to herein, certain video poker machines currently located in taverns, coffee shops, and other business establishments in Allegheny County including those listed in this affidavit, were identified. These video poker machines are manufactured by several companies and bear any one of several names. However, regardless of the name used, the operational and play features of all the video poker machines identified herein are fundamentally the same. (See, copy of Holmes' Affidavit which is attached hereto and made a part hereof by reference.)

---

that interstate transportation of gambling devices is "lawful."

**3.** Although the Duffy affidavit does not so indicate, the Court notes that the opinions are both reported. *See United States v. 294 Various Gam-*

*bling Devices*, 718 F.Supp. 1236 (W.D.Pa.1989) (Weber, J.); and *United States v. 294 Various Gambling Devices*, 731 F.Supp. 1246 (W.D.Pa. 1990) (Cohill, J.).

**4.** *294 Various Gambling Devises*, 718 F.Supp. at 1240–41.

10. From personal observation and/or from my discussions with the other investigating officers and agents during the course of this investigation, I know that each of the video poker machines described herein was operable and was made available for play by patrons, by the persons operating the business establishment in which the said machine is located.

11. I have reason to believe that each of the video poker machines and/or some of the integral or essential components of same was transported in interstate commerce in that manufacturers are located outside the Commonwealth of Pennsylvania. Video poker machines manufactured by Merit Industries of Ben–Salem, PA, are assembled using critical components manufactured beyond the boundaries of the Commonwealth of Pennsylvania. (See copy of Holmes' Affidavit).

12. I have been advised by Mr. William L. Holmes of the FBI (retired) that the video draw poker machines referred to herein are designed and manufactured primarily for use to facilitate gambling. Further, I have been advised by Pennsylvania State Trooper William Cunningham and City of Police Detective John Bosetti that they have historically played video poker machines in and around the city [sic] of Pittsburgh during the course of this investigation and received "payoffs" after accumulating the pre-selected number of credits.

Duffy affidavit, at 8–10. At this point, the Duffy affidavit sets forth location-specific factual averments, which will be summarized shortly. Following the location-specific averments, the Duffy affidavit includes two final paragraphs:

14. I have been advised by Pennsylvania State Troopers, City of Pittsburgh detectives and confidential informants that they have historically received or observed payoffs, including those noted above, and on most occasions the person making the

payoffs at the establishment recorded the same on a business record generally consisting of a tablet or note card. Further, I have been advised by the same investigators and informants that on each such occasion, the person making the payoff knocked off the machine with a knock-off switch or other device to clear it for use by the next player. I have also been advised by the same Pennsylvania State Troopers and city detectives that they have investigated and seized video poker machines for more than six years in the Allegheny County, Pennsylvania area, and that in that time period they have observed business records in various forms ranging from note pads to ledgers utilized by the establishment to record certain aspects of their video poker machine business such as phone numbers of routemen or servicemen, dates and amounts of money generated by the machine, splits with the vendor or patron/player, and other such similar records.

15. Within the past week, law enforcement officers involved in this investigation, confidential informants, cooperating witnesses and your affiant have returned to all of the above-described establishments, with the exception of Matrix and E–Z Mini Self Storage, and have observed video draw poker machines located within those premises.

Duffy affidavit, at 21–22.

Before turning to the location-specific averments of the Duffy affidavit, the Court will first turn to the incorporated-by-reference affidavit by former FBI agent William L. Holmes.[5] The Holmes affidavit recites the affiant's qualifications. It then describes the historical evolution of knock-off switches and meters from primarily mechanical components to hidden, electronic components.[6] The historical evolution section of the Holmes affidavit concludes:

---

5. Former agent Holmes was the Government's expert in the Erie Cases as well. *See, e.g., U.S. v. 294 Various Gambling Devices,* 718 F.Supp. at 1241, 1243.

6. The Holmes' affidavit also describes changes in the imagery used to play the games from cards to, *e.g.,* various humanoid characters with assigned point-values. The warrants in question did not authorize the seizure of any machines with such features.

14. The historical evolution of the electronic video-display gambling device is the product of the versatility of computer technology and the willingness of the manufacturers to create disguises and deception to circumvent the judicial system. This evolutionary process supports the contention that electronic video-display devices, of a certain nature, were designed and manufactured for the purpose of gambling.

Holmes affidavit, at 7. The next section recites that manufacturers sell their equipment to vendors, who place them in locations at no cost to the location owner.

The Holmes affidavit next contains a section entitled "Investigative Intelligence." This section states in its entirety:

17. The investigation conducted by the Federal Bureau of Investigation reveals that the following video poker machines are in current operation at the Pine Hollow Country Dairy, Jack's Restaurant, Kail's Coffee Shop, the Coffee Shop and the Idlewood Inn:

> Hi–Lo Double Up Joker Poker
>
> Riviera
>
> Draw Poker
>
> Draw Bonus
>
> Super Draw
>
> Top Draw
>
> Chicken Draw

These devices characteristically contain "bill acceptor" mechanism which allow a player to insert into the device United States currency in one, five and twenty dollar denominations. Units of play (credits, points, etc.) are recorded on a display meter equivalent to the value of the currency inserted. (Each device also contains coin receptacles which allow the inserting of one or more coins, i.e., quarters consideration).

To activate these devices, a player presses a button (start, ante, bet, etc.) to record the number of units or play to be risked on the outcome of the next hand. A "deal" button is pressed to display images of five cards on the video screen. From one to five "discard" buttons are pressed to remove unwanted cards. A "draw button" is pressed to replace those cards that were previously discarded.

When a winning combination occurs, a varying number of units of play are awarded (reward), depending upon the value of the hand.

A coin, or U.S. currency (consideration) is inserted into the device to initiate play of a game which is based predominantly upon chance, inasmuch as a player cannot appreciably influence the final outcome of play, for an award (reward), which is equal to or greater than the initial consideration.

18. Several of these devices typically contain additional feature of "double-up" and/or "jokers wild." The "double-up" feature does not come into play until a winning combination occurs. A player then has the option of taking what was previously won or take a chance on correctly identifying the value of an unknown card to win double what was previously won, or nothing, by pressing the appropriate buttons.

In most instances, a player must risk a predetermined number of units or [sic] play (either 2 or 4 credits) to activate the "jokers wild" feature.

Activation of the "double-up" feature and/or the "jokers wild" feature does not enhance the ability of a player to influence the final outcome of play, therefore, the game depicted is based predominantly upon chance.

A "knock-off" feature is used to remove unused units of play from the video-display meter [sic]. An amount of money equal to the value of the unused "credits" knocked-off is paid to the player by the location owner, or their representative.

When this "pay off" occurs, the electronic video-display draw poker devices are being used as gambling devices.

Holmes affidavit, at 8–10.

The next section of the Holmes affidavit is entitled "Significance of Vendor Agreements" It indicates that the vendor is responsible for maintaining the machine under the typical vendor-location owner contract. It further indicates that the vendor employs one or more "routemen," who remove the money in

the machines, view and record the data generated by operation of the knock-off and metering functions, reimburses the location owner for moneys paid out and divides the remaining money according to the agreed split between the vendor and the location owner. This section continues:

22. Recent judicial decisions and aggressive enforcement of gambling laws has influenced the current trends in the type of "split" now used by vendors. Some interpretations of these court decisions implies that a "knock-off switch," or a "knock-off meter" must be present in a device for it to be considered a gambling device in and of itself.

As a result of this concept, vendors and manufacturers have removed, relocated, disguised or disabled the external appearance of the metering system.

23. Inasmuch as the location owner will continue to pay off players for the unused "credits," the vendors have devised a division of monies that does not rely on metering systems.

24. This concept is identified as a "25/75 split." 25% of the monies contained in the device goes to the vendor and 75% to the location owner. The location owner is now responsible for paying out of the 75% share.

Statistically, over an extended period of play, the vendor and location owner will maintain the same profit level as was derived from the previously described "50/50 split."

25. Another technique used by vendors to disguise the true nature of the device was to remove, disguise, or disable the "knock-off switch" in addition to the "knock-off meter." The knock-off function is now accomplished by the "play down" method.

Assume a device is set so that the maximum number of "credits" that can be played (risked) on a single hand is 30. Now if a player wants to redeem a large number of "credits" for cash, the location owner would press the "play" button to record the maximum number of "credits" that can be risked. When 5 cards appear on the video screen, the "stand button" is pressed, thus resulting in a losing hand. This same sequence is followed until all of the unused "credits" have been knocked off. With this method, 150 credits could be knocked off in approximately 30 to 45 seconds.

24. [sic] Not using or disabling the accounting feature does not change the nature of the device. The inherent characteristics of the electronic video-display gambling device are "consideration," "chance," and "reward." These new accounting methods merely obviate the need for a knock-off switch and a knock-off meter while obtaining the same results.

Holmes affidavit, at 11–13.

The Holmes affidavit continues with a section entitled "Gambling Device Characteristics." It recites the three elements that the judicial system has held must be present to classify a device as a gambling device per se—consideration, chance and reward. Further, it states, "Electronic video-display devices contain operational characteristics which are indicative of gambling devices...." Holmes affidavit, at 13. It discusses the retention ratio, where pay-offs are made on less than all dealt hands, as the source of a video poker machine's profit potential. It states that compared to draw poker against other persons, video poker machine gambling entails less skill and hence more chance. The Holmes affidavit concludes this section by stating, "Video poker machines bear operational characteristics which are used to identify the nature of the machines as designed and manufactured primarily for use in gambling," and by briefly describing the following functional aspects of the machines: the presence of two or more meters to measure total receipts and pay-offs; the presence of knock-off switches to record credits knocked off (*i.e.,* pay-offs); a very short time of play; the lack of skill as a factor in the outcome; a multiple coin feature; a fixed pay-off rate; and that the player always plays against the house. Holmes affidavit, at 15.

In the following section, entitled "Current Observations," the Holmes affidavit repeats the list of specific names of video poker machines that the federal investigation had

revealed at the locations to be searched. *See supra,* page 8 (paragraph 17 of the Holmes affidavit). The "Current Observation" section concludes:

> All of the above-named devices are of the same type or kind of electronic video-display gambling devices that were being operated on December 19, 1989, when the FBI conducted a search and seizure.
>
> These electronic video-display gambling devices contain the identical play and operational characteristics as previously described.
>
> I am familiar with each of the above-named devices, through my personal experience in examining and playing identical devices over the past 10 years.

Holmes affidavit, at 16.

The Holmes affidavit then lists the four manufacturers of the video poker machines listed therein. It continues:

> 31. Of those manufacturers listed, only Merit Industries is located within the state of Pennsylvania. However, it is to be noted that every electronic video-display gambling device is made up of numerous components, i.e., cabinets, coin acceptors, wiring harness, printed circuit board (PCB), microprocessors, power unit, television tube, electronic components supporting the operation of the video and audio output, etc.
>
> There are several of these components which are not manufactured in the state [sic] of Pennsylvania, specifically, the television tube and supporting components, and the coin acceptor mechanism.
>
> Inasmuch as the game depicted by an electronic video display device is displayed on the video screen, it becomes a critical component, without which the device could not function.
>
> A coin acceptor mechanism is also a critical component, inasmuch as the insertion of a coin into the coin acceptor mechanism activates the device, permitting a player to play the game. The device could not function without the coin acceptor mechanism.

Finally, the Holmes affidavit has a "Conclusion," which states:

> 32. I have had approximately 10 years of experience working in the field of electronic video-display gambling devices (i.e., draw poker) as well as mechanical, electro-mechanical and electronic gambling devices. I have examined over 5,000 electronic video poker machines, and, in the course of these examinations, have personally played these types of devices over 500,000 times.
>
> Based upon my experience and knowledge, it is my opinion that each of the video poker machines described in this Affidavit is a machine consisting of mechanical and/or electrical components designed and manufactured primarily for use in connection with gambling. Each, when operated and as a result of the application of an element of chance, entitles the player to receive money or property (i.e., credits) which entitles the player to continue to play without inserting additional consideration. Each device contains the same operational and play characteristics which I have previously described herein.

Holmes affidavit, at 18–19.

The Court now returns to the location-specific averments of the Duffy affidavit. In addition to information regarding the locations from which Duffy Conley's video poker machines were seized, the Duffy affidavit also includes information regarding the Pine Hollow Country Dairy/Isaly's and E–Z Mini Self Storage. The Court will consider all the information contained in the Duffy affidavit as to each individual location. The Duffy affidavit presents the information in a tabular form. The Court will quote the "narrative" section of the table and include information from other sections as necessary in brackets.

### Kail's Coffee Shop

The Duffy affidavit includes information from five dates in the Kail's Coffee Shop section:

> [September 23, 1988] Seizure of the above poker machines [1 Hi–Lo Double Up Joker Poker; 1 Top Draw Poker] by the City of Pittsburgh Police after officers were paid off by employees on 8/8/88 and

8/29/88. All machines were found to be gambling devices.

[December 19, 1989] Special Agent Robert Mitchell and Sgt. Earl Woodard seized the above described 5 poker machines [4 Riviera; 1 Super Draw] at Kail's Coffee Shop after a payoff by an employee to a confidential informant (CI # 1) on 11/13/89 and observation of another payoff on 12/8/89. All were found to be gambling devices.

[March 5, 1990] A cooperating witness (CW # 1) advised SA Charles J. Duffy that shortly after the seizure of 5 poker machines by the FBI and City of Pittsburgh Police on 12/19/89 those machines were restored by John "Duffy" Conley [5 unknown named poker machines]. This witness advised that the business is managed by a female named Monica Kail. This same cooperating witness (CW # 1) advised SA Duffy on 3/22/90 that the Kail's Coffee Shop poker machine operation is a 24 hour a day operation.

[June 21, 1990] Another cooperating witness (CW # 2) advised SA Charles Duffy on 6/21/90 that Kail's Coffee Shop, 11 Boggs Avenue, Pittsburgh PA continues to operate a 24 hour poker machine business using 2 Super Draw poker machines, 1 Chicken Draw and what was believed to be 2 Draw Poker machines. Monica Kail manages this operation and pays off of [sic] all accumulation [sic] of points in excess of 40.

[July 12, 1990] SA Dammann entered Kail's Coffee Shop on 7/12/90 and observed a white female, approximately 40–50 years of age working at that location. In a separate room located in the rear area of the coffee shop, SA Dammann observed a total of five poker machines to include 1 Super Draw, 1 Riviera and 3 unknown poker machines.

Duffy affidavit, at 10–12.

### Idlewood Inn

The Duffy affidavit includes information from six dates regarding the Idlewood Inn:

[December 19, 1989] 6 Hi–Lo Double Up Joker Poker machines were seized by the FBI after observation of payoffs on 11/15/89 by FBI agents and observation of payoff by a confidential informant (CI # 2) on 12/4/89. All were found to be gambling devices.

[February 21, 1990] (Observation of cooperating witness). This cooperating witness (CW # 3) observed and played one of three poker machines ["3 poker machines"] located in the Idlewood Inn on 2/21/90. The witness also observed another individual being paid off for an accumulation of points by a bartender.

[March 1, 1990] SA Charles J. Duffy and IRS Agent Daniel Hanlon observed the 3 poker machines [3 Super Draw] inside the bar area of the Idlewood Inn. Two customers were observed playing these poker machines.

[March 23, 1990] SA Charles J. Duffy and IRS Agent Daniel Hanlon observed the 3 poker machines [3 Super Draw] inside the bar area of the Idlewood Inn.

[July 11, 1990] SA Charles J. Duffy observed 3 Super Draw poker machines inside the bar area of the Idlewood Inn. One male customer was observed playing the middle machine.

Duffy affidavit, at 12–14.

### Pine Hollow Country Dairy/Isaly's

The Duffy affidavit includes information from five dates regarding the Pine Hollow Country Dairy/Isaly's:

[9/23/88] Seizure of the above poker machines [4 Chicken Draw; 2 Draw Poker; 1 Top Draw] by PA State Police. All machines found to be gambling devices.

[12/19/89] Seizure of the above 4 poker machines [2 Double Chicken Draw; 1 Draw Poker; 1 Hi–Lo Double Joker Poker] by the FBI. All machines found to be gambling devices. PA State Police and FBI Special Agents Charles J. Duffy and John Donnelly had observed these poker machines on 11/17/89 and 11/15/89.

[July 3, 1990] Confidential Informant (CI # 3) advised on 7/3/90 that the Pine Hollow Country Dairy had replaced the 4 machines taken by the FBI in a raid in December 1989. These machines were owned by John "Duffy" Conley who replaced

them shortly after the FBI raid. CI # 3 has seen the poker machines [5 unknown named poker machines] in the Pine Hollow Country Dairy on several occasions and as recently as the week of 6/24/90.

[July 10, 1990] Confidential Informant (CI # 3) went to the Pine Hollow Country Dairy. CI # 3 observed one customer playing one of these poker machines [5 unknown named poker machines].

[July 12, 1990] On 7/12/90 SA Dammann entered the Pine Hollow Country Dairy and observed 5 poker machines to include 2 Riviera, 1 Draw Bonus, 1 Draw Poker and one unknown named poker machine. The machines are located in the back of the main room, enclosed in a paneled room with 2 doors.

Duffy affidavit, at 14–16.

### The Coffee Shop

The Duffy affidavit includes information from three dates regarding the Coffee Shop:

[September 23, 1988] Seizure of above machines [1 Top Draw; 1 Hi–Lo Double Up Joker Poker] by City of Pittsburgh Police. All machines found to be gambling devices. Payoff had been previously obtained or observed by Officers of the Pittsburgh Police Department on 7/22/88, 7/28/88 and 9/14/88.

[December 19, 1989] Seizure of above 5 poker machines [5 poker machines located in back room] by FBI and Pittsburgh City Police. All machines determined to be gambling devices. Payoffs had been obtained or observed by Officers of the Pittsburgh City Police on 6/5/89, 6/7/89, 9/19/89 and 11/15/89.

[July 12, 1990] SA Andrea Dammann observed 5 poker machines [4 Draw Poker; 1 unknown named poker machine] located in a separate room inside the kitchen area. Two young females were observed working there, one described as in her teens and the other being approximately middle to late 30's.

Duffy affidavit, at 16–17.

### Jack's Restaurant

The Duffy affidavit includes information from three dates regarding Jack's Restaurant:

[September 23, 1988] Seizure of the above poker machines [3 Hi–Lo Double Up Joker Poker] by Pittsburgh City Police after being paid off by the owner and an employee on 6/21/88 and 9/16/88. All machines found to be gambling devices.

[December 19, 1990] Seizure of the above 5 poker machines [2 Riviera; 2 Super Draw; 1 Hi–Lo Double Up Joker Poker] by FBI after City Police were paid off on 11/12/89. All machines found to be gambling devices.

[July 12, 1990] SA Dammann observed 4 poker machines [1 Hi–Lo Double Up Joker Poker; 3 unknown named machines] inside Jack's Restaurant in a separate room located to the right of the main entrance. The door to this separate room is observed to be near the tables located in the restaurant. Also observed working at the restaurant was a white male, age approximately 40 to 50, heavy set, wearing a shirt with the name "Jack." Also observed working was another male and a female.

Duffy affidavit, at 17–18.

### E–Z Mini Self Storage

The Duffy affidavit relates that Trooper William Cunningham of the Pennsylvania State Police told S.A. Duffy of information from an anonymous informant who called himself "Eagle Eye." Eagle Eye advised that Duffy Conley was storing poker machines of unknown numbers and types at the E–Z Mini Self Storage in Greentree, Pennsylvania. A registration check on the license plate of the truck delivering the video poker machines yielded the name of a man from Butler, Pennsylvania.

Eagle Eye related that Duffy Conley was placing his businesses in his employees' names. Eagle Eye related "Matrix Vending" among the front companies being used by Conley. Eagle Eye related that video poker machines had been seen at building five of the E–Z Mini Self Storage during the week of July 6, 1990.

### Matrix Company

Regarding the premises of the Matrix Company, the Duffy affidavit states:

On 3/20/90, a cooperating witness (CW # 4) advised Special Agent Charles J. Duffy that John "Duffy" Conley was operating a portion of his poker machine business from a new location on Helen Street in the Bottoms section of McKees Rocks and that servicemen handling poker machines were operating out if that location. This witness had spoken to one of the servicemen who stated he worked out of Duffy's subsidiary office in the Bottoms and serviced poker machines.

On 3/28/90, Trooper William Cunningham, Pennsylvania State Police, Bureau of Criminal Investigation West, Pittsburgh, PA advised Special Agent Charles J. Duffy that he had been advised by an anonymous caller named "Eagle Eye" on 3/27/90, who had provided him with reliable information in the past, that John "Duffy" Conley was placing all his property and businesses in his employees' names. One of the vending companies that is in this category was named Matrix Vending. "Eagle Eye" stated this business and others were purchased by John "Duffy" Conley and been run by employees who were fronting as the owners.

On 7/2/90, cooperating witness # 5 (CW # 5) was interviewed by Special Agent Duffy. CW # 5 advised that John "Duffy" Conley no longer services his poker machines at his facility located at 3105 [sic] Windgap Avenue, Pittsburgh, PA, but that he now services his poker machines through a company he recently formed named Matrix Company. Matrix Company is located on Helen Street in the Bottoms section of McKees Rocks and they do all the service work for John "Duffy" Conley's poker machines.

CW # 5 advised that Gary Morgan, an employee of "Duffy's" as a mechanic, is no longer employed at the 3105 Windgap Avenue, Pittsburgh, PA location. Morgan is now employed as the manager of Matrix Company for John "Duffy" Conley at Helen Street, McKees Rocks, PA. In addition to Gary Morgan, the following employees of John "Duffy" Conley are no longer employed at the Windgap Avenue office but are now stationed at Matrix Company and service the poker machine part of "Duffy's" business: Mike Pelligrini[;] Bob Minor[.]

CW # 5 stated he has been to the Matrix Company location within the last 30 days and has talked to the employees there and knows that they service poker machines out of that location. CW # 5 stated that he knows that calls concerning problems with poker machines are now referred to Matrix Company in McKees Rocks, PA.

CW # 5 also stated the Matrix Company has persons employed as movers and it is their job to pick up and transport the poker machines from one location to another. One of these movers is named James Gradnick.

On 7/10/90, Special Agent Charles J. Duffy was contacted by Trooper William Cunningham, Pennsylvania State Police, Bureau of Narcotic Investigation West, Pittsburgh, PA, who advised Special Agent Charles J. Duffy that on 7/9/90 he observed a pickup truck bearing PA License YL 71947 that was carrying 3 poker machines. A check of Pennsylvania Bureau of Motor Vehicles reveals that PA YL 71947 was registered to Matrix Company, 324 Helen Street, McKees Rocks, PA.

On 7/12/90, Special Agent Charles J. Duffy served a subpoena on Duquesne Light, Pittsburgh, PA for records concerning Matrix Company, 324 Helen Street, McKees Rocks, PA.

Duquesne Light records revealed that on 3/1/90 service was established at 324 Helen Street, McKees Rocks for an individual named Gary Morgan at the 1st floor of 324 Helen Street, McKees Rocks. Morgan listed a telephone number at that location as 331–7075.

A review of the records of Bell of Pennsylvania on 7/12/90 revealed 331–7075 to be a listed number for Matrix Service, 324 Helen Street, 1st floor, Mckees Rocks, PA.

Records of the FBI in a separate matter revealed that the property at 324 Helen Street, McKees Rocks, PA had previously been owned by a Harry/Roy Musko and was sold to John "Duffy" Conley, who in turn sold the property to Gary Morgan.

Previous investigation conducted by Investigative Assistant Karen Nesbitt of the Federal Bureau of Investigation on 7/3/90 revealed that a review of records at the Recorder of Deeds Office, Pittsburgh, PA had determined that the property at 324 Helen Street, McKees Rocks, PA was owned by Gary Morgan.

Duffy affidavit, at 19–21.

## THE WARRANTS

The *capias* clauses of the warrants are identical, and authorize the seizure of:

1. Any and all Video Draw Poker Machines including but not limited to models bearing names such as: Hi–Lo Double Up Joker Poker, Top Draw, Riviera, Super Draw, Chicken Draw, Draw Poker, Draw Bonus.

2. Any and all knock-off switches and devices used to eliminate accumulated points, games or credits from Video Draw Poker Machines.

3. Any and all coins or currency in the video poker machines.

4. Any and all coins or currency utilized to pay off winners of the video draw poker machines and any and all containers for said coins and currency.

5. Any and all gambling paraphernalia and records including but not limited to: names and addresses of the owner, vendors, users, routemen, collectors, movers, solicitors, salespersons, servicemen, distributors and manufacturers relating to video poker machines; contracts setting forth agreements between vendor and the establishment for video poker machines; documents, ledgers, books regarding the machine usage, number of plays, amounts deposited in the machines, amounts of payoffs to winners, percentage and income earned by vendor and establishment from video poker machines.

6. Any and all business records reflecting banking transactions, cancelled checks, purchase and sales orders, invoices, shipping and receiving receipts; and invoices relating to video poker machines.

7. Any and all documents relating to loans and/or other financial transactions between vendor and establishment.

8. Keys and access codes to the video draw poker machines.

9. Remote circuitry that permits activation of electronic accounting feature in the poker machine which records points eliminated/earned.

All of which constitute fruits, instrumentalities and evidence of the offense of interstate transportation of gambling devices, in violation of Title 15, United States Code, Section 1171 *et seq.* and Title 18, United States Code, Section 2.

*See, e.g.,* The Coffee Shop, GOV'T 81.

## DISCUSSION

Defendant Duffy Conley challenges the July, 1990 warrants contending, first, that there is stale information included in the warrant and second, there is not the quantum of facts averred necessary for probable cause to exist. The first contention is wholly without merit. The second contention, ultimately unavailing, requires further discussion.

The standard of review to be employed in reviewing a search warrant is clear:

"[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." [*Illinois v.*] *Gates,* 462 U.S. [213] at 238, 103 S.Ct. [2317] at 2332 [76 L.Ed.2d 527 (1983)] (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). Keeping in mind that the task of the issuing magistrate is simply to determine whether there is a "fair probability that contraband or evidence of a crime will be found in a particular place," id., a reviewing court is to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found.

*United States v. Conley,* 4 F.3d 1200, 1205 (3d Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994).

The warrants are quite broad, but the only statutory violation invoked and supported as to each element with any facts is quite narrow. The *capias* clauses of the warrants seek the fruits, instrumentalities and evi-

dence of gambling *activity* ongoing at each location, while the Duffy affidavit provides probable cause to believe that the fruits, and perhaps some limited evidence, of interstate transportation of "gambling devices," *i.e.*, video poker machines, are to be found on the premises.

The Duffy affidavit invokes 15 U.S.C. §§ 1171, 1172, 1173, 1177 and 18 U.S.C. § 2. Sections 1171 and 1177 can be laid to one side because neither section outlaws any conduct. Section 1171 defines "gambling device," and Section 1177 provides for forfeitures in cases of violations of Sections 1172 and 1173.

■ Section 1173(a–c) prohibits conduct. Section 1173(a) prohibits the manufacture of any gambling device by persons engaged in businesses affecting interstate commerce "unless . . . [within the applicable time] such person has registered with the Attorney General under this subsection, regardless of whether such device ever enters interstate or foreign commerce." Section 1173(b) prohibits engaging in the business of "repairing, reconditioning, buying, selling, leasing, using, or making available for use by others any gambling device," if the person knowingly introduces any such gambling device into interstate or foreign commerce, "unless . . . [within the applicable time] such person has registered with the Attorney General under this subsection." Section 1173(c) prohibits engaging in the business of "repairing, reconditioning, buying, selling, leasing, using, or making available for use by others any gambling device," if the person knowingly buys or receives any device that has been transported in interstate or foreign commerce, "unless . . . [within the applicable time] such person has registered with the Attorney General under this subsection."

The Duffy affidavit in no way supports the probability of a Section 1173 violation. A search of the Duffy affidavit for reference to the registration status of *anyone* is in vain. Such information is objectively obtainable and uniquely available to federal agents. Notwithstanding this Court's deferential standard of review of probable cause, the Court is forced to conclude that to the extent that the Magistrate Judge relied upon Sections 1173(a–c) in issuing the search warrants, the Magistrate Judge erred.

■ Section 1172 also prohibits conduct. Subject to certain qualifications not pertinent here, it prohibits the knowing transportation of "any gambling device to any place in a State or possession of the United States from any place outside of such State or possession." 15 U.S.C. § 1172. Section 1171(a)(2)(B) & (3) provides the applicable definition of "gambling device," stating:

> (a) The term "gambling device" means—

> (2) any other machine or mechanical device (including, but not limited to, roulette wheels and similar devices) designed and manufactured primarily for use in connection with gambling, and . . . (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property; or

> (3) any subassembly or essential part intended to be used in connection with any such machine or mechanical device, but which is not attached to any such machine or mechanical device as a constituent part.

15 U.S.C. § 1171(a)(2)(B) & (3). The inquiry under Section 1171(a)(2)(B) is a broad inquiry into the objective intent present at the time of a machine's manufacture. *U.S. v. 294 Various Gambling Devices*, 718 F.Supp. at 1242 (Weber, J.); *U.S. v. 294 Various Gambling Devices*, 731 F.Supp. at 1248 (Cohill, C.J.); *see also United States v. Dyer*, 750 F.Supp. 1278, 1286 & n. 15 (E.D.Va.1990) (comparing objective intent required under drug paraphernalia statute to Section 1172(a)(2)'s "designed and manufactured primarily for use in connection with gambling" standard). Whether a device is a gambling device may be determined by examining the objective physical and functional characteristics of the device. *U.S. v. 294 Various Gambling Devices*, 718 F.Supp. at 1243–46 (Weber, J.); *U.S. v. 294 Various Gambling Devices*, 731 F.Supp. at 1248 (Cohill, C.J.); *Pennsylvania Video Operators v. United States*, 731 F.Supp. 717, 719 (W.D.Pa.1990) (Cohill, C.J.) ("As recited in Judge Weber's Opinion, consideration of the various charac-

teristics of each game and machine is the core of the analysis under the statute"). That a device is a "gambling device" may be established by comparison to a device already shown to be a gambling device. *U.S. v. 294 Various Gambling Devices*, 731 F.Supp. at 1249 (Cohill, C.J.) ("Although these machines are inoperative and partially disassembled, because each is of a make and model found to have been designed and manufactured to facilitate gambling, they are illegal devices under § 1172(a)(2) and forfeit").

■ Under such a standard, the Duffy affidavit, supplemented by the Holmes affidavit, clearly provided the Magistrate Judge with probable cause to believe that the video poker machines *of a type identified by name* and described by features in either affidavit were gambling devices. This does not at first blush appear to support *capias* clauses one through three.

The Duffy affidavit indicated that the FBI agents during their last visits found the presence of video poker machines of unknown names in Kail's Coffee Shop (3 unknown named poker machines), the Coffee Shop (1 unknown named poker machine), and Jack's Restaurant (3 unknown named poker machines). Moreover, the Duffy affidavit mentions no named poker machines as having been seen at the Matrix premises. Although the Duffy affidavit associates Matrix to Duffy Conley and Duffy Conley to Kail's Coffee Shop and the Pine Hollow Country Dairy/Isaly's, the FBI agent's last observations at those locations revealed unknown named poker machines. At first blush, it appears that the Court can only support the Magistrate Judge's determination to permit seizure of unknown named poker machines by reference to the fact that they depict the game of video poker. That reveals almost nothing about the objective physical and functional characteristics indicative of a device designed or manufactured as a "gambling device." *Cf. U.S. v. 294 Various Gambling Devices*, 731 F.Supp. at 1249 ("At this point we know little of these machines other than they appear to depict a game of video poker. We know nothing of the characteristics of play on these five machines, or the many other factors recited in the prior Opin-

ion which are indicative of a gambling device. Absent evidence on such matters, summary judgment must be denied").

■ Were that all the information in the Duffy affidavit, the Court would conclude that the Duffy affidavit failed to give the Magistrate Judge a substantial basis for evaluating the probable status of the unknown named poker machines subject to seizure under *capias* clauses one through three. Two specific factors present in the Duffy affidavit, however, provide a basis for believing it is fairly probable that the unknown named poker machines share the objective physical and functional characteristics of the machines identified by name. First, the Duffy affidavit related the prior involvement of the location operators with video poker machines that qualify as gambling devices under Section 1172(a)(2)(B). Second, the Duffy affidavit also related that the unnamed video poker machines were placed with video poker machines known to be gambling devices. In the absence of either of these factors, the Court's review of the Magistrate Judge's determination of probable cause would be substantially more troubling. Nonetheless the Court finds that the Magistrate Judge had a substantial basis for finding probable cause in support of *capias* clauses one through three.

The Court does not mean to suggest that the Duffy affidavit properly invoked one of the limited federal statutes regulating gambling *activity*. The prohibition of illegal gambling businesses, 18 U.S.C. § 1955, was not invoked before the Magistrate Judge, and the Duffy affidavit utterly failed to include factual support necessary to show probable cause regarding violation of the registration requirements under 18 U.S.C. § 1173(a–c). The Court merely recognizes the inferences from the gambling activity described to the nature of the unknown named poker machines.

The Court does not mean to suggest that it accepts the apparently intended implication that all "video draw poker machines," that is, all machines that depict the game of video poker, are gambling devices under federal law. Like Judge Weber, this Court views such contentions "with some skepticism,"

*U.S. v. 294 Various Gambling Devices,* 718 F.Supp. at 1248 (Weber, J.). Also like Judge Weber, this Court need not reach the issue, for the Court has found the Magistrate Judge's issuance of the warrants for the poker machines justified on other grounds. *Cf. id.*

Finally, though the Duffy affidavit may not fully support the *capias* clauses four through seven, it is of no moment in these proceedings. Clauses four through seven appear to be targeted at evidence of gambling activity, not interstate transportation of gambling devices. Nevertheless, Duffy Conley has established "standing" only with respect to the poker machines. Clauses one through three authorized the seizure of the machines and their contents. Those clauses are supported by probable cause. Evidence seized in reliance upon them is not subject to the exclusionary rule, irrespective of the lack of factual support for the other clauses. *See United States v. Christine,* 687 F.2d 749, 750–51 (3d Cir.1982). Defendant John F. "Duffy" Conley's challenge to the July 19, 1990 searches, (Document No. 377, in part), will be denied.